727 S.E.2d 605

Jane DOE, Appellant,

v.

**SOUTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 27083.

Supreme Court of South Carolina.

Heard Nov. 3, 2010.

Decided Dec. 28, 2011.

Patricia Logan Harrison, of Columbia, and Stuart M. Andrews, Jr. and Jennifer I. Cooke, Nelson Mullins Riley & Scarborough, both of Columbia, for Appellant.

William H. Davidson, II, and Kenneth P. Woodington, Davidson & Lindemann, both of Columbia, for Respondent.

Justice KITTREDGE.

This appeal presents the question of whether Respondent South Carolina Department of Health and Human Services and its agent, the South Carolina Department of Disabilities and Special Needs (DDSN), "properly ceased Mental Retardation/Related Disability services to"[1] Appellant Jane Doe, a twenty-eight-year-old woman with undeniable cognitive and adaptive deficits. Based on a purported legal standard that the "onset of Mental Retardation must be before the age of eighteen (18) years according to accepted psychological doctrine[,]" the Hearing Officer concluded Doe was not mentally

---

1. Final Administrative Order, June 5, 2006.

retarded. The Administrative Law Court (ALC) affirmed this legal determination, as well as the Hearing Officer's factual findings. Because the decision of the Hearing Officer and ALC is controlled by an error of law, we reverse and remand.

# I.

# BACKGROUND

## A.

Medicaid is a program through which the federal government, through the Social Security Administration (SSA), provides financial assistance to states so that they may furnish medical care to needy individuals. *Wilder v. Virginia Hosp. Assoc.*, 496 U.S. 498, 502, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). Participation in the program is voluntary; however, participating states must comply with requirements imposed by the Medicaid Act and related regulations. *Id.* To receive federal funding, a state must submit and have approved a "plan for medical assistance" that describes the nature and scope of the state's Medicaid program. *Id.* A state's plan must provide medical services for the "categorically needy" and, among other things, must provide services under any option to all Medicaid beneficiaries for whom they are medically necessary. *See* 42 U.S.C. § 1396a(a)(1), (a)(10)(A)(i), (a)(10)(B) (2006); *Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 651 n. 4, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003).

Supplemental Security Income (SSI), which is Title XVI of the Social Security Act, provides support for those who are aged, blind, or disabled and subsist on a limited income. 20 C.F.R. § 416.1100 (2011). To receive SSI, a recipient must have a disability such that he cannot accomplish "substantial gainful activity" for profit. 20 C.F.R. § 416.905 (2011). Federal regulations provide that an individual found eligible for SSI is automatically enrolled in the Medicaid program and is entitled to the base level of benefits the state must provide to all Medicaid beneficiaries. 42 U.S.C. § 1396a(10)(A)(i)(II) (2006); 42 C.F.R. § 435.909(b)(1) (2010); *Pharm. Research*, 538 U.S. at 651 n. 4, 123 S.Ct. 1855.

Since 1981, Medicaid has provided funding for state-run home and community based services ("HCBS") through a

waiver program. For Medicaid-eligible individuals whose medical needs require an institutional level of care, the waiver program provides Medicaid funding to States to provide those individuals HCBS in lieu of institutional care.[2] 42 U.S.C. § 1396n(c) (2006); 42 C.F.R. § 441.300 (2010); *see Olmstead v. L.C.*, 527 U.S. 581, 601, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999). The waiver program permits an eligible recipient who is mentally retarded to receive Medicaid-funded HCBS, rather than institutional care in an Intermediate Care Facility for the Mentally Retarded (ICF/MR). Once an individual is found eligible for such waiver services, a state must conduct periodic reviews to ensure the recipient still meets the waiver program eligibility requirements. 42 C.F.R. § 441.302(c)(2) (2010).

For purposes of basic Medicaid eligibility, the definition for mental retardation, in relevant part, is as follows:

Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested *during the developmental period; i.e., the evidence demonstrates or supports onset of impairment before age 22.*

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05 (2011) (emphasis added).[3]

### B.

For a state to participate in the Medicaid HCBS waiver program, it must submit a detailed application on a form provided by the federal government describing the group of individuals to whom the services will be offered. 42 C.F.R. § 441.301(b)(3) (2010). For the purpose of defining eligibility for waiver services, a state is free to impose in its waiver application eligibility criteria which are more restrictive than basic Medicaid eligibility requirements. 42 C.F.R. § 441.301(b)(6) (2010).

---

**2.** A showing that the average annual cost of HCBS would not exceed that of institutional services is also required. 42 U.S.C. § 1396n(c)(2)(D) (2006).

**3.** Although this particular part of the regulations concerns benefits under a different portion of the Social Security Act, this listing of impairments is the operative listing for Supplemental Security Income and Medicaid purposes. 20 C.F.R. § 416.905 (2011).

Based on South Carolina's waiver application, to continue to be eligible to receive HCBS waiver services, a person must meet the following criteria:

1. The person has a confirmed diagnosis of mental retardation or a related disability.

 AND

2. The person's needs are such that supervision is necessary due to at least one of the following: impaired judgment, limited capabilities, behavior problems, abusiveness, assaultiveness or because of drug effects/medical monitorship.

 AND

3. The person is in need of services directed toward a) the acquisition of the behaviors necessary to function with as much self-determination and independence as possible; or b) the prevention or deceleration of regression or loss of current optimal functional status.

Attachment 1 to Appendix D–3, South Carolina's Mental Retardation/Related Disabilities (MR/RD) Waiver Document (Effective October 1, 2004–September 30, 2009).

The second and third eligibility criteria are commonly referred to collectively as "Level of Care." These criteria describe the minimum services and functional deficits necessary to qualify for Medicaid-sponsored institutional care in an ICF/MR. South Carolina's waiver application provides that Level of Care reevaluations will take place at least every twelve months.[4] Appendix D–2, South Carolina's Mental Retardation/Related Disabilities (MR/RD) Waiver Document (Effective October 1, 2004–September 30, 2009). South Carolina's waiver application with the federal government does not include any age-of-onset requirement and reveals no intent to vary from or otherwise limit the group of individuals encompassed by the SSI definition of mental retardation. On the waiver application in effect in 2005, South Carolina

---

4. South Carolina filed a Request for a Renewal to a § 1915(c) Home and Community–Based Services Waiver (Effective January 1, 2010) and a Request for an Amendment to a § 1915(c) Home and Community–Based Waiver (Effective March 1, 2011). However, neither the renewal or amendment waiver application altered the Level of Care evaluation criteria or frequency.

checked letter "f," thereby expressing its intent to provide waiver services to the group identified as "mentally retarded persons and persons with related disabilities." In addition, where asked whether it would impose any "addition[al] targeting restrictions" on the provision of waiver services, South Carolina stated "Not applicable."

In 1990, the South Carolina General Assembly adopted a definition of mental retardation that parallels the SSI definition adopted by the federal government in 1985. *See* Act. No. 496, 1990 S.C. Acts 2184, 2187; 50 Fed.Reg. 35038, 35068–69 (Aug. 28, 1985). The definition, codified at South Carolina Code section 44–20–30, states that mental retardation is "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period."[5] The term "developmental period" was new to the 1990 definition, and it is upon the construction of that term that this matter largely turns.

■ DDSN promulgated a regulation which recites the SSI/44–20–30 definition of mental retardation (with only minor changes in phrasing) and defined the term "developmental period" as the period from conception to age twenty-two, consistent with the SSI definition.[6] 26 S.C.Code Ann. Regs.

---

5. Prior to the 1990 Act, South Carolina defined a "mentally retarded person" as "any person, other than a mentally ill person primarily in need of mental health services, whose intellectual deficit and adaptive level of behavior require for his benefit, or that of the public, special training, education, supervision, treatment, care or control in his home or community, or in a service facility or program under the control and management of the Department." S.C.Code Ann. § 44–21–30 (1976).

Subsequent to the briefing and arguments in this case, the General Assembly, in 2011 Act No. 47, changed the references to mental retardation in section 44–20–30 to "intellectual disability." Although the definition of intellectual disability is the same as it was for mental retardation, it has been moved to subsection 12 of section 44–20–30. To ensure our references are consistent with the record in this case, we will continue to use the terminology in effect at the time this case arose and was argued.

6. Chapter 88 of the South Carolina Code of Regulations draws its statutory authority from title 44, chapter 20 of the South Carolina Code. While chapter 88 continues to list its statutory authority as article 3 of chapter 21, title 44 of the 1976 Code, that article was repealed in 1990. The relevant statutory provisions were reenacted as article 5 of chapter 20. This change was part of the same act that adopted the new

88–210(F) (Supp.2010). Thus the definition of mental retardation under state law—Regulation 88–210(F)—mirrors the SSI definition with respect to the age-of-onset requirement. No South Carolina regulation imposes additional diagnostic criteria for mental retardation in the context of waiver services. Nevertheless, DDSN attempted through a "Policy of Determination of Eligibility" to impose more restrictive diagnostic criteria for mental retardation for eligibility for waiver services in the form of an age-eighteen-onset requirement for mental retardation. The policy states:

> DDSN evaluates referred individuals in accordance with the *definitions of Mental Retardation outlined in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders*–Fourth Edition (DSM–IV, 1994) and the *American Association on Mental Retardation* (AAMR 9th Edition, 1992).
>
> Mental Retardation refers to substantial limitations in present functioning. *Diagnosis of mental retardation based on the DSMIV and AAMR definitions* requires the following three criteria be met:
>
> . . . .
>
> 3. *The onset of mental retardation is before age 18 years.*

South Carolina Dep't of Disabilities and Special Needs Policy for Determination of Eligibility Guidelines to Operationalize Eligibility Policy (Effective July 1, 1998) (emphasis added).[7]

---

definition in section 44–20–30. 1990 S.C. Acts 2184, 2200–04. Notably, while the pre-1990 definition of mental retardation applied only to the article of title 44 in which it was located, the new definition in section 44–20–30 explicitly applied to the entire chapter. Thus, the General Assembly manifested its intent that the definition in section 44–20–30 would apply to the licensing provisions interpreted in chapter 88 of the South Carolina Code of Regulations. Those regulations dictate that the developmental period extends to age twenty-two. In the more than twenty years following these changes in the law, DDSN has not altered the regulations to reflect a contrary view.

7. In ignoring Regulation 88–210 and finding DDSN's policy guidelines properly supplied more specific criteria outside the waiver application, the dissent acknowledges the fact that DDSN's policy guidelines are not regulations promulgated by a state agency; yet the dissent finds the policy guidelines are entitled to deference in interpreting section 44–20–30. In accordance with our statutory law, we hold an agency guideline does not have the force of law, and in any event, can never

## II.

## FACTUAL/PROCEDURAL HISTORY

Jane Doe was born on March 24, 1983, the product of an indisputably complicated birth. She was born at thirty weeks gestation, weighing just two pounds, three ounces. At ten months old, she was diagnosed with cerebral palsy, and her doctors diagnosed her with a seizure disorder at age eleven. As a result of her conditions, she has limited use of her left hand, difficulty with balance, and an awkward gait. Additionally, Doe presents with other physical and emotional conditions, including the nerve disorder Reflex Sympathetic Dystrophy, anxiety, depression, and anger management problems.

In 2001, Doe applied for SSI benefits from the SSA. The psychological evaluation submitted to the SSA showed her Full Scale Intelligence Quotient (IQ) to be sixty-nine, Verbal IQ to be seventy-seven, and Performance IQ to be sixty-five. Using these scores and personal observations of Doe's functional abilities, the doctor examining her concluded "[s]he has multiple physical, mental, and emotional impairments, including cerebral palsy with left spastic hemiparesis and Mild Mental Retardation." The SSA awarded Doe SSI based on a primary diagnosis of mental retardation and a secondary diagnosis of cerebral palsy. That determination has never been challenged.[8] Respondent South Carolina Department of Health and Human Services (HHS) and its agent, DDSN, sought reimbursement from the federal government for ser-

---

trump a regulation. Our law provides that " '[r]egulation' means each agency statement of general public applicability that implements or prescribes law or policy or practice requirements of any agency. *Policy or guidance issued by an agency other than in a regulation does not have the force or effect of law."* S.C.Code Ann. § 1–23–10(4) (2005) (emphasis added). Thus, because the age-eighteen-onset requirement found in DDSN's policy guidelines has not been formally adopted as a regulation, it does not have the force and effect of law and is entitled to no deference. Indeed, the only South Carolina law addressing the age onset requirement is Regulation 88–210.

8. In other litigation involving Doe, the United States Court of Appeals for the Fourth Circuit noted that Doe "has developmental disabilities including epilepsy, mild mental retardation, and cerebral palsy." *Doe v. Kidd,* 501 F.3d 348, 351 (4th Cir.2007).

vices they supplied using the diagnostic code for mental retardation.

Doe is unquestionably disabled. Looking to her IQ scores beginning at age twelve, Doe's full-scale IQ scores ranged from a low of sixty-six to a high of seventy-three.

DDSN approved Doe's application for waiver services in March 2003, and provided her with HCBS. Because Doe's parents were unable to care for her at home, DDSN placed Doe in a Community Training Home II (CTH II) facility operated by the Newberry County Disabilities and Special Needs Board.[9]

In 2005, DDSN re-evaluated and terminated Doe's eligibility for waiver services. Doe contended her benefits should not be terminated and requested a fair hearing to review that decision pursuant to 42 U.S.C. § 1396a(a)(3) (2006) and section 126–380 of the South Carolina Code of Regulations. Relying on DDSN's definition of mental retardation in its policy guidelines that the onset of mental retardation must occur prior to age eighteen, the Hearing Officer referenced "accepted psychological doctrine" and concluded Doe was not mentally retarded.[10] Finding the absence of mental retardation (and related disability) dispositive, the Hearing Officer did not reach the issue of whether Doe met the Level of Care requirements for waiver services eligibility. The ALC affirmed the Hearing Officer. This appeal followed.

## III.

### STANDARD OF REVIEW

Our standard of review is governed by the Administrative Procedures Act. S.C.Code Ann. § 1–23–380(5) (Supp.2010).

___

9. A CTH II is not an ICF/MR facility; it is classified as respite care rather than institutional care. Patients in a CTH II receive twenty-four hour supervision and some training depending on their assessed needs and care. A CTH II facility has one to two staff responsible for up to four individuals. During the pendency of this appeal, DDSN agreed to continue providing Doe HCBS benefits.

10. The hearing officer further determined that Doe did not meet the definition of a related disability. Because we conclude the hearing officer applied the incorrect definition of mental retardation, we need not reach Doe's separate challenge to the related disability finding.

The Court may affirm the agency's decision, remand the matter, or reverse or modify it

if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(a) in violation of constitutional or statutory provisions;

(b) in excess of the statutory authority granted of the agency;

(c) made upon unlawful procedure;

(d) affected by other error of law;

(e) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(f) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

*Id.* We reverse because the decisions of the Hearing Officer and ALC are controlled by an error of law.

## IV.

## LAW/ANALYSIS

### A.

It is Doe's position that the SSA determination of disability and receipt of basic Medicaid through SSI is binding on DDSN's determination of whether she is entitled to receive waiver services. In the alternative, Doe argues it was error to impose an age-eighteen-onset requirement in determining whether she is mentally retarded and that DDSN must use the age-twenty-two-onset definition of mental retardation.

We disagree that, in the context of waiver services, DDSN is bound by the SSA's determination that Doe is disabled, for Doe conflates her entitlement to basic Medicaid services by virtue of her SSI disability with the issue of whether she is eligible to receive HCBS through the optional Medicaid waiver program. The federal government has made it manifestly clear that states have wide discretion in designing a waiver program that is tailored to the needs of the particular state. For example, in the "Application for a § 1915(c) Home and Community–Based Services Waiver" promulgated by the Cen-

ters for Medicare & Medicaid Services, the purpose of the HCBS Waiver Program is as follows:

> The Medicaid Home and Community–Based Services (HCBS) waiver program is authorized in § 1915(c) of the Social Security Act. The program permits a State to furnish an array of home and community-based services that assist Medicaid beneficiaries to live in the community and avoid institutionalization. The State has broad discretion to design its waiver program to address the needs of the waiver's target population. Waiver services complement and/or supplement the services that are available to participants through the Medicaid State plan and other federal, state and local public programs as well as the supports that families and communities provide.
>
> The Centers for Medicare & Medicaid Services (CMS) recognize[ ] that the design and operational features of a waiver program will vary depending on the specific needs of the target population, the resources available to the State, service delivery system structure, State goals and objectives, and other factors. A State has the latitude to design a waiver program that is cost-effective and employs a variety of service delivery approaches, including participant direction of services.

Therefore, it is clear that states may impose additional criteria to the SSI definition of mental retardation for the purposes of waiver services eligibility, and the SSI's prior determination of Doe as mentally retarded is not binding on the state's waiver services eligibility determination of whether Doe is mentally retarded.

### B.

 Although we reject Doe's initial argument, we do agree with her contention that it was error to impose an age-eighteen-onset requirement in determining whether she is mentally retarded. South Carolina's waiver application allows it to do one very specific thing: substitute home or community based services (HCBS) for mandatory Medicaid services with respect to a defined subset of categorically needy persons, without providing HCBS to every categorically needy person in the State. 42 C.F.R. § 440.240(b) (2010) ("The [State] plan must provide that the services available to any individual in

the following groups are equal in amount, duration, and scope for all recipients within the group: (1) The categorically needy ....."); *id.* § 440.250(k) ("[T]he services provided under [a] waiver [of § 440.240] need not be comparable for all individuals within a group."); *id.* § 441.301(b)(6) (requiring a waiver request to "[b]e limited to one of the ... target groups or any subgroup thereof" and defining the target groups as the aged, disabled, mentally retarded, developmentally disabled, and mentally ill). Thus, the scope of HCBS furnished under the waiver program and recipient eligibility criteria are defined by the waiver application. However, South Carolina's waiver application with the federal government does not include any age-of-onset requirement.

To the extent a state is permitted to issue regulations interpreting the general eligibility requirements included in its waiver application, South Carolina regulations reveal no intent to vary from the requirement that the onset of mental retardation occur prior to age twenty-two. Rather, the only regulation addressing eligibility for HCBS states that HCBS "may be provided to Medicaid eligible persons eighteen years of age or older, who have been determined by community long term care to require a skilled or intermediate level of care." 27 S.C.Code Ann. Regs. 126–304 (1976). No South Carolina regulation imposes additional diagnostic criteria for mental retardation in the context of waiver services.

Moreover, we find DDSN's policy guidelines are not entitled to any deference in this regard. The scope of DDSN's rulemaking authority is defined by the South Carolina General Assembly, and DDSN may exercise such authority only in that manner. As discussed above, in 1990, the General Assembly adopted a definition of mental retardation in line with the SSI definition adopted by the federal government in 1985. Thereafter, DDSN promulgated regulation 88–210(F), which recites the SSI/44–20–30 definition of mental retardation and defines the term "developmental period" as the period from conception to age twenty-two, consistent with the SSI definition.[11]

---

11. The dissent asserts that Regulation 88–210 is inapplicable to the question before us because it refers only to licensing, not eligibility. This ignores the fact that Regulation 88–210 is an interpretation of the same statute, section 44–20–30, purportedly interpreted by DDSN's policy guidelines. We adhere to the basic principle that the same word

Thus, the informal agency policy issued by DDSN, purporting to implement an age-eighteen-onset requirement should be disregarded in determining what classes of mentally retarded South Carolinians are entitled to Medicaid waiver services because it lacks the force and effect of law and is in direct conflict with Regulation 88–210(F), which defines the developmental period as extending to age twenty-two.

## V.

## CONCLUSION

In sum, it is clear that South Carolina *could have* listed additional criteria in the waiver application for the purpose of defining the population to whom it would provide waiver services. Likewise, DDSN *could have* promulgated regulations incorporating those additional criteria as part of the definition of mental retardation. But no such steps were taken. Rather, South Carolina adopted a broad definition of mental retardation in section 44–20–30, using language that parallels the SSI definition, and in Regulation 88–210, DDSN interpreted that definition in a manner consistent with the SSA. DDSN's interpretation of section 44–20–30 in its policy guidelines directly conflicts with Regulation 88–210 and should be disregarded.

We find the Hearing Officer and ALC erred in applying an age-eighteen-onset requirement for mental retardation. We reverse and remand for consideration of whether, applying the proper legal standard for mental retardation (onset prior to age twenty-two), Doe is eligible to continue to receive waiver services.

---

should not be given disparate meanings within a single statutory scheme. Further, the plain language of the regulation shows that the definitions in 88–210 apply to the licensing of *all* programs "for the care, maintenance, education, training or treatment" of mentally retarded persons that operate for at least ten hours per week, unless specifically excluded. 26 S.C.Code Ann. Regs. 88–105. Nothing in the text of 88–105 or 88–210 excludes non-residential waiver services from the scope of the definitions found therein, and the dissent does not appear to contest that some of the programs subject to the definitions in 88–210 are waiver services. Therefore, in our view, Regulation 88–210 expresses the view that the term "developmental period" in section 44–20–30 has the same meaning in the context of waiver services as it does in the context of basic Medicaid services.

REVERSED AND REMANDED.

TOAL, C.J. and BEATTY, J., concur. HEARN, J. concurring in part and dissenting in part in a separate opinion in which PLEICONES, J., concurs.

Justice HEARN.

Respectfully, I concur in part and dissent in part. I agree with the majority's holding that South Carolina can impose more restrictive criteria for mental retardation in its waiver application or in a regulation. Where I part company with the majority, however, is with respect to whether Regulation 88–210(F) applies in this case. Because I do not believe it does, I would find this absence of controlling statutory or regulatory criteria permitted DDSN to apply its own diagnostic criteria to Doe and would affirm.

## I.

As the majority correctly notes, the starting point for our analysis is the waiver application itself. Although many states elected to supply a wide range of specific diagnostic criteria in their applications,[12] South Carolina has not done so.[13] Similar-

---

12. For example, Mississippi's application defines mental retardation as an IQ score of approximately seventy or below, age of onset prior to age eighteen, and a determination of deficits in adaptive behavior. Application for 1915(c) HCBS Waiver, Mississippi, App. B–6(d). Alaska defines the condition as an IQ of less than seventy, plus or minus five points; age of onset prior to age twenty-two; and "a substantial disability to the individual's ability to function in society." Application for 1915(c) HCBS Waiver, Alaska, App. B–6(d). Iowa simply incorporates by reference the definition of mental retardation found in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders—Fourth Edition (DSM–IV). Application for 1915(c) HCBS Waiver, Iowa, App. B–1(b).

13. South Carolina is not alone. Massachusetts' application, for example, merely defines the target group as "[p]articipants age 18 and older with an intellectual disability as defined by the Massachusetts DDS who meet the ICF–MR level of care and who are determined through an assessment process to require Community Living Supports due to a moderate level of assessed need." Application for 1915(c) HCBS Waiver, Massachusetts, App. B–1(b). Virginia's application does the same thing: "Waiver services are limited to the following groups: individuals of any age with a diagnosis of intellectual disability/mental

ly, Section 44–20–30(11) of the South Carolina Code (2002) simply defines mental retardation as "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period." Due to this lack of guidance, in 1998 DDSN itself adopted the criteria from the DSM–IV and the American Association on Mental Retardation, Ninth Edition, defining mental retardation as: (1) an IQ of approximately seventy or below; (2) a score of approximately seventy or below on standardized measures of adaptive behavior; and (3) onset before the age of eighteen. These guidelines have not been promulgated into an official regulation.

Section 88–210(F) of the South Carolina Code of Regulations differs from DDSN's guidelines in that it extends the developmental period to the individual's twenty-second birthday. *See* 26 S.C.Code Ann. Regs. 88–210(F) (2009). The majority accordingly posits that Regulation 88–210(F) conflicts with, and thus trumps, DDSN's guidelines as to the developmental period. However, the regulatory definition of "developmental period" by its terms applies only to the regulations in question, *see id.* § 88–210, which concern the licensing of various facilities by DDSN and not eligibility for waiver services, *see id.* § 88–105. The majority thus states correctly that the scope of this regulation is "the licensing of *all* programs" for the treatment of the mentally retarded, even if those facilities provide waiver services. However, two unitalicized words are of particular import yet side-stepped by the majority: "licensing" and "programs." Just as with statutes, we apply the plain meaning of regulations "without resort to subtle or forced construction to limit or expand the regulation's operation." *Byerly v. Connor,* 307 S.C. 441, 444, 415 S.E.2d 796, 799 (1992). Because Regulation 88–210(F) plainly applies only to the licensing of programs and not eligibility for services, it has no application in the case before us. As the majority itself recognizes, the *only* regulation concerning eligibility for waiver services provides no guidance as to what constitutes mental retardation. *See* 27 S.C.Code Ann. Regs. 126–304(A) (1976) ("Home and community based services may be provided to Medicaid eligible persons eighteen years of age

---

retardation...." Application for 1915(c) HCBS Waiver, Virginia, App. B–1 (b).

or older, who have been determined by community long term care to require a skilled or intermediate level of care."). The policy guidelines at issue here clearly are not at odds with this regulation, nor do they conflict with Regulation 88–210(F) as they do not concern the licensing of programs.

In support of its conclusion that the regulation applies, the majority details the history of Regulation 88–210 and section 44–20–30 to conclude that Regulation 88–210(F) actually is an interpretation of section 44–20–30(11). When this regulation was passed, the licensing provisions were contained in Article 3 of Chapter 21, and that chapter and article were (and still are) cited as the sole authority for it. The majority then points out that these provisions were subsequently moved to Article 5 of Chapter 20 at the time the General Assembly added the undefined term "developmental period" to the definition of mental retardation found in the general provisions of Article 1 of Chapter 20. In my opinion, importing the specific licensing definition of developmental period into the general provisions solely based on this renumbering of the statutes lets the tail wag the dog, and I accordingly decline to divine any expansion of the regulation's scope. The majority therefore "resort[s] to subtle ... construction to ... expand" the regulation's operation. *See Byerly*, 307 S.C. at 444, 415 S.E.2d at 799. To borrow the majority's words, "[i]n the more than twenty years following these changes [to Title 44]," DDSN has never sought to expand the regulation beyond its plainly stated boundaries.

Even accepting as correct the majority's contention that Regulation 88–210(F) controls, the only criteria provided is that the symptoms of mental retardation must present themselves prior to age twenty-two. The open question therefore is what those symptoms must be in the absence of a comprehensive definition found in the waiver application or a regulation, namely whether the remainder of the diagnostic criteria in the guidelines apply or the SSI definition controls.

By acknowledging DDSN is free to adopt its own criteria which are more restrictive than those found in the SSI definition and narrowing its focus on the conflict between the guidelines and Regulation 88–210(F), the majority ostensibly agrees the guidelines are in effect unless they conflict with

state law. However, the majority at times seems to suggest that the SSI definition has been adopted as a matter of state law and therefore is the controlling definition. In particular, the majority consistently references the SSI definition and how it "parallels," "mirrors," is "in line with", and is "consistent with" state legislative enactments. Furthermore, the majority writes that Regulation 88–210(F) "recites" the SSI definition of mental retardation and "interpret[s] [section 44–20–30(11) ] in a manner consistent with" it. The majority also states that "the scope of HCBS furnished under the waiver program and recipient eligibility criteria are defined by the waiver application," and this application "reveals no intent to vary from or otherwise limit the group of individuals encompassed by the SSI definition of mental retardation." It accordingly appears the majority holds that state law incorporates the SSI definition. The conclusion which follows is that DDSN's guidelines are invalid *in toto* because they wholly conflict with this definition. To the extent this is the majority's holding, I disagree.[14]

In my opinion, section 44–20–30(11) and Regulation 88–210(F) are not similar to the SSI definition in any substantial regard. The SSI definition for mental retardation is as follows:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of impairment before age 22.

> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded; or

---

14. If the majority is not holding that the SSI definition applies, I do not understand the relevance of the many comparisons between this definition and section 44–20–30(11), Regulation 88–210(F), and the waiver application.

B. A valid verbal, performance, or full scale IQ of 59 or less; or

C. A valid verbal, performance, or full scale IQ of 60–70 and a physical or other mental impairment imposing an additional and significant work-related limitation or function; or

D. A valid verbal, performance, or full scale IQ of 60–70, resulting in at least two of the following:

1. Marked restriction in activities of daily living; or

2. Marked difficulties in maintaining social function; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05. Section 44–20–30(11) simply defines mental retardation as "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period." When these two sections are juxtaposed, it is clear that the *only* mirror image between the two is in the first line of the SSI definition. In my opinion, there is nothing to suggest that the General Assembly implicitly agreed to incorporate the remaining 156 words by using language similar to the first line of the SSI definition of mental retardation.

Like section 44–20–30(11), Regulation 88–210(K) defines mental retardation in broad terms. The only difference is that subsection (F) defines developmental period as being before the individual's twenty-second birthday. While it does provide one more piece of the puzzle—and only as to the licensing of programs and not waiver eligibility—it conspicuously lacks the myriad other diagnostic criteria present in the SSI definition. I accordingly disagree that section 44–20–30(11) and Regulation 88–210(F) are similar to the SSI definition and would find no intent to adopt the SSI definition of mental retardation as a matter of state law. Because it is not the law of this State, I would stay true to the majority's central premise that states are free to set their own diagnostic

criteria and find the SSI definition does not inform our analysis.

Due to the lack of controlling statutory or regulatory guidance, it was incumbent upon DDSN to set its own criteria for mental retardation. I certainly agree that such policy guidance ordinarily does not have the effect of law and can never trump a valid regulation or statute. *See* S.C.Code Ann. § 1–23–10(4) (2005). However, I do not read the majority's opinion as suggesting that such guidance must be wholly disregarded in cases where there are no controlling statutes or regulations. In this case, I do not believe there is any controlling law, and it was therefore necessary for DDSN to issue its own criteria. I would accordingly adhere to our precedents deferring to agency interpretations of statutes and hold the hearing officer did not err in applying DDSN's standard, including onset before age eighteen. *See Byerly Hosp. v. S.C. State Health & Human Servs. Fin. Comm'n*, 319 S.C. 225, 229, 460 S.E.2d 383, 386 (1995) ("[B]ecause the Commission has been designated as the single state agency for implantation of Medicaid, great deference must be accorded its interpretations of Medicaid laws and regulations.").

## II.

Because I believe the hearing officer did not commit an error of law in applying DDSN's definition of mental retardation, I proceed to reach the other issues raised on appeal by Doe.

### A. Evidence of Mental Retardation

Turning to facts of this case, Doe's scores place her right on the border of mental retardation under DDSN's definition. Between the ages of twelve and seventeen, her full scale IQ scores ranged from a low of sixty-eight—which was felt to be an underestimate of her abilities—to a high of seventy-three. Additionally, the only adaptive behavior score obtained before her eighteenth birthday was a seventy. At this point, it is left to the professional judgment of those reviewing Doe's application to determine whether she is mentally retarded under DDSN's standards. While the record contains diagnoses made by various individuals, including physicians who treated Doe, that she was mentally retarded before she turned eighteen, the record also contains testimony of DDSN officials expressing concern about the bald nature of some of these diagnoses and evidence that Doe's levels of functioning may

have been higher than meets the eye. Additionally, the record contains findings that she is in the borderline range of intelligence, which is not equivalent to mental retardation. The record contains similarly conflicting evidence of the impact her intellectual deficits have on her adaptive skills.

Viewing the record in its entirety, I cannot say the ALC erred in affirming the hearing officer. I believe there is substantial evidence to support the conclusion that Doe does not suffer from mental retardation. Indeed, there may be substantial evidence to support the opposite conclusion as well. But, the fact that reasonable minds may reach an opposite result based on the same evidence does not render the hearing officer's order invalid. *Waters v. S.C. Land Res. Conservation Comm'n,* 321 S.C. 219, 226, 467 S.E.2d 913, 917 (1996) (stating the fact that one could draw inconsistent conclusions from the same body of evidence does not render the agency's decision unsupported by substantial evidence). The parties here presented voluminous evidence of Doe's condition, each side fleshing out its position amply. In the end, this case boiled down to a quintessential factual determination and battle of the experts. Under our standard of review, I would find no error in the hearing officer's decision.[15]

Doe next argues the hearing officer and the ALC erred in not giving controlling weight to the diagnoses of mental retardation made by her treating physicians. She bases her argument on 20 C.F.R. § 404.1527(d)(2), which provides, "If [the SSA] find[s] that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [the SSA] will give it controlling weight." Without discussing whether DDSN had sufficient reason to not give controlling weight to these diag-

---

15. At various points, Doe also argues that DDSN and HHS should be estopped from denying she suffers from mental retardation because they sought reimbursement from the federal government for services they supplied using the diagnostic code for mental retardation. However, it appears Doe did not learn of this fact until discovery. To the extent such an act could give rise to estoppel against the government, Doe's argument must fail because she cannot prove any reliance on this billing practice. *See Grant v. City of Folly Beach,* 346 S.C. 74, 80, 551 S.E.2d 229, 232 (2001).

noses, the language in this regulation by its very terms applies only to SSA determinations of disability. No party here disputes that Doe is disabled. Instead, we are faced with a state agency determination of whether Doe is eligible for ICF/MR waiver services. I can find no statutes or regulations, and Doe has not directed us to any, which require a state agency in DDSN's position to give controlling weight to a treating physician's diagnosis.

This is not to say, however, that a treating physician's diagnosis is not entitled to any weight. To the contrary, DDSN and the hearing officer ought to examine and consider the opinions of those doctors as relevant, probative evidence of an applicant's condition. Under the facts of a particular case, DDSN and the hearing officer may attach any such weight to these diagnoses as they see appropriate and the facts permit. While the policy behind 20 C.F.R. § 404.1527(d)(2) is a good one, there is no similar requirement under our regulations, and this Court is not in a position to create one. Instead, the diagnoses should be considered along with the whole body of evidence in the record. On appeal, the ALC and the appellate courts also should consider them in light of all the other evidence in determining whether DDSN's decision is supported by substantial evidence, or is arbitrary or capricious.[16]

In a similar vein, Doe also argues the hearing officer restricted the rights of her treating physicians to practice medicine by not giving controlling weight to their diagnoses. Every state seeking to offer waiver services must provide in the application "[a] description of who will make these evaluations and how they will be made." 42 C.F.R. § 441.303(c)(1). South Carolina's approved program specifically permits non-physicians to determine whether an applicant suffers from mental retardation.[17] South Carolina Waiver, App. B–6(c). In this case, DDSN and the hearing officer disagreed with the

---

**16.** For example, if a treating physician's diagnosis has not been called into question or there are no competing diagnoses, not giving it controlling weight may be arbitrary and an abuse of discretion. That situation is not present in the case before us.

**17.** The waiver application in effect at the time permitted physicians to make an eligibility determination. Based on this, Doe argues that because her treating physicians found her to be mentally retarded, their diagnoses control. However, this argument assumes that her treating

diagnoses made by Doe's treating physicians. As discussed, while the fact that some doctors did diagnose her as being mentally retarded certainly is relevant evidence, it is just evidence. Simply because DDSN officials and the hearing officer in a regulatory action disagreed with the diagnoses of Doe's treating physicians in no way limits their ability to practice medicine. Not only did these officials have the authority to determine eligibility for MR/RD waiver services, it would be absurd to hold that a disagreement with a physician infringes on that doctor's ability to practice medicine in any way.

Doe finally argues the hearing officer erred in considering evidence outside of the record. In particular, Doe argues the hearing officer concluded the SSA awarded SSI benefits for an unidentified condition other than mental retardation based on his own experiences as an SSA disability examiner and disability hearing officer. However, I believe Doe's argument is not preserved for review as she has raised it for the first time before this Court. Doe accordingly argues that because she is an incompetent, we should relax our preservation rules. *See Galloway v. Galloway*, 249 S.C. 157, 160, 153 S.E.2d 326, 327 (1967). It is within our discretion to relax the preservation requirement when the rights of a minor or incompetent are concerned. *Ex parte Morris*, 367 S.C. 56, 65, 624 S.E.2d 649, 654 (2006). I would decline to do so in this case because Doe was at all times well-represented by counsel. *Cf. Cumbie v. Cumbie*, 245 S.C. 107, 113, 139 S.E.2d 477, 480 (1964) (reaching unpreserved issue because "[i]t is quite apparent here that the guardian ad litem for the incompetent and the minor defendants treated the appointment as a pure formality, and, as far as the record goes, made no effort whatever to protect the interests of either the incompetent or said minors").

## B. Related Disability

Doe argues she has two related disabilities, cerebral palsy and epilepsy. At no point did DDSN ever question whether she suffers from either of those conditions. Instead, the relevant discussion was the *extent* of those conditions, includ-

---

physicians were actually "performing initial evaluations of level of care for waiver participants." Nothing in the record indicates that they were performing such a function here.

ing whether they both had the requisite effect on Doe's adaptive skills and, in particular, whether her epilepsy was as severe as she contended it was. While the witnesses in this case did observe and document her seizures, there was no SSA diagnosis of epilepsy as there was for cerebral palsy.[18] Accordingly, she first argues the hearing officer erred in not following the procedures outlined in 42 C.F.R. § 435.541 when evaluating her seizures. *See* 42 C.F.R. § 435.541(c)(4)(i) ("The [state] agency must make a determination of disability in accordance with the requirements of this section if any of the following circumstances exist: ... The individual applies for Medicaid as a non-cash recipient ... and ... [a]lleges a disabling condition different from, or in addition to, that considered by SSA in making its determination. . . ."). However, this requirement only applies when a state agency instead of the SSA is making a *disability* determination instead of the SSA, which only occurs in specific situations not applicable here. *See* Medicaid Program; Eligibility Determinations Based on Disability, 54 Fed.Reg. 50,755 (Dec. 11, 1989). Doe is not asking DDSN to determine whether she is disabled by her epilepsy; she is asking DDSN to determine whether this condition is a related disability for purposes of receiving HCBS. Because these are two different determinations, I do not believe the hearing officer erred in not following 42 C.F.R. § 435.541 with respect to Doe's epilepsy.

She next argues that the hearing officer erred in applying the definition of related disability found in section 44–20–30(15)[19] as opposed to the Medicaid[20] definition. Although I believe the hearing officer did not err in applying the definition from section 44–20–30(15), any error involved would be

---

18. The doctor performing the SSI examination concluded "[s]he has multiple physical, mental, and emotional impairments, including cerebral palsy with left spastic hemiparesis and Mild Mental Retardation." Based on this assessment, which included a fairly thorough review of Doe's condition, the SSA awarded her SSI with a primary diagnosis of mental retardation and a secondary diagnosis of cerebral palsy.

19. Section 44–20–30(15) provides,

"Related disability" is a severe, chronic condition found to be closely related to mental retardation or to require treatment similar to that required for persons with mental retardation and must meet the following conditions:

harmless. Both definitions contain the same requirement for limitation in three of six major life areas, and as I conclude below, the hearing officer's findings that Doe's conditions are not so limiting is supported by substantial evidence. Doe also argues the hearing officer in any event erred in his application of the definition of related disability found in section 44–20–30(15). I agree with Doe that the hearing officer erred in his interpretation, but I would find this error harmless as well for the same reason.

The record establishes that Doe's adaptive behavior scores were within the range for mental retardation, and therefore within the range for a related disability. Additionally, the evidence shows that her limitations arose prior to her twenty-second birthday and are likely to continue indefinitely. However, I believe there is substantial evidence to support the conclusion that Doe has not met the requirement of experiencing "substantial limitations" in three of the six major life areas listed in the statute.

The hearing officer described her limitations as follows:

> (a) It is attributable to cerebral palsy, epilepsy, autism, or any other condition other than mental illness found to be closely related to mental retardation because this condition results in impairment of general intellectual functioning or adaptive behavior similar to that of persons with mental retardation and requires treatment or services similar to those required for these persons.
> (b) It is manifested before twenty-two years of age.
> (c) It is likely to continue indefinitely.
> (d) It results in substantial functional limitations in three or more of the following areas of major life activity: self-care, understanding and use of language, learning, mobility, self-direction, and capacity for independent living.
> DDSN has offered no additional guidance with respect to related disabilities.

**20.** The regulatory definition reads in part,

> Persons with related conditions means individuals who have a severe, chronic disability that meets all of the following conditions:
> (a) It is attributable to—
> (1) Cerebral palsy or epilepsy; or
> (2) Any other condition, other than mental illness, found to be closely related to mental retardation because this condition results in impairment of general intellectual functioning or adaptive behavior similar to that of mentally retarded persons, and requires treatment or services to those required for these persons.

42 C.F.R. § 435.1010.

[Doe] walks with a mild limp, with an awkward gait and she has some difficulty with balance secondary to her left hemiparesis. [Doe] has weakness in her left arm with some contracture in her left hand. She can only use her left hand as an assist/stabilizer for small objects and she has difficulty using zippers, and buttoning small buttons. [Doe] is independent with dressing, bathing, toileting, eating, transferring from one surface to another and ambulation; however, she may require some prompting to perform some of these activities at times.

In his final order, the hearing officer made a series of specific findings leading to the conclusion that Doe does not have a substantial limitation in any of the six major life areas listed in the statute. In sum, he found,

[Doe's] Cerebral Palsy and Epileptic Seizure Disorder do not prevent [Doe] from performing all self-care activities with little or no assistance or supervision. Her Cerebral Palsy and Epileptic Seizure Disorder do not affect her understanding and use of language or learning; however, [Doe's] longstanding mental disorders and learning disorder and/or borderline intellectual function do affect these areas. She is able to be independently mobile despite her physical handicaps. [Doe's] Cerebral Palsy and Epileptic Seizure Disorder do not limit [Doe's] capacity for independent living; however, her longstanding mental disorders are the biggest obstacle to this area of major life activity. [Doe's] Cerebral Palsy and Epileptic Seizure Disorder do not result in substantial functional limitations in self-care, understanding and use of language, learning, mobility, self-direction or capacity for independent living; therefore, she does not have a Related Disability.

As the ALC recognized, Doe has submitted voluminous evidence to support her position that she does indeed suffer from a related disability. Numerous witnesses recounted the limitations Doe's conditions place on her daily life, and no one before the Court contends that Doe can lead a truly normal life. DDSN, on the other hand, introduced equally voluminous evidence to demonstrate that her limitations may not be as severe as they appear and are perhaps the product of her intentional efforts to not integrate herself into the community. In the end, the hearing officer found that any limitations Doe

does have generally result from mental illness and disorders, not cerebral palsy and epilepsy.[21] Once again, we are faced with an extremely close factual determination. But, also once again, it is not the province of an appellate court to weigh the evidence before it on appeals from administrative proceedings. Based on our standard of review, I believe there is substantial evidence to support the finding that Doe does not have substantial limitations in any of the major life areas and accordingly does not suffer from a related disability. Additionally, I can discern no evidence that this finding by the hearing officer was arbitrary, capricious, or an abuse of discretion. Rather, it appears to be a well-reasoned decision following a thorough review of the evidence presented.

## C. Due Process Claims

Doe finally argues the hearing officer violated her constitutional due process rights in three ways: (1) basing his decision on reasons other than those contained in the notice provided by DDSN to Doe; (2) determining Doe failed to exhaust her administrative remedies; and (3) permitting DDSN to engage in retaliatory conduct. I disagree.

As to her first argument, a state cannot withdraw Medicaid benefits without providing notice and an opportunity to heard. *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 786–87, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980). In order to meet the requirements of procedural due process, the State must provide adequate notice, adequate opportunity to be heard, the right to introduce evidence, and the right to confront and cross-examine witnesses. *In re Vora*, 354 S.C. 590, 595, 582 S.E.2d 413, 416 (2003).

Initially, I do not believe Doe's notice arguments are preserved for review. Nowhere in the record does it appear she raised this issue to the hearing officer or the ALC. Indeed, Doe concedes as much by preemptively arguing in her initial brief that we should relax our preservation rules because she is an incompetent. As discussed previously, I would decline to

---

**21.** Doe again argues the hearing officer failed in not giving controlling weight to the conclusions of the physicians who treated Doe's seizures and cerebral palsy. As I concluded *supra,* failure to do so is not legal error.

do so under the facts of this case. Furthermore, I question the merits of her argument. Doe claims the hearing officer engaged "[i]n a classic case of trial by ambush" when he considered the results of evaluations performed by school psychologists offered by DDSN from her high school years. However, Doe's argument ignores the fact that she had three months from the close of DDSN's case-in-chief to prepare her own case.[22] It would therefore appear she had ample notice and opportunity to respond to this alleged ambush.

Second, Doe contends the ALC erred in finding she has not exhausted her remedies with respect to her argument that DDSN did not provide her with free choice of facilities for treatment. This issue is now moot in light of the decision of the United States Court of Appeals for the Fourth Circuit that her freedom of choice claim fails as a matter of law. *See Doe v. Kidd,* 501 F.3d 348, 358–60 (4th Cir.2007) (*Doe I* ).

Finally, Doe argues the final DDSN evaluation, the one which led to the termination of her benefits, was in retaliation for a separate civil rights lawsuit she filed in federal court.[23] In her brief to this Court, Doe engages in a lengthy discussion of the record but cites no law to support her contentions. She then argues due process entitles her to notice and an opportunity to respond to the final 2005 evaluation, again citing no law and making only passing references to the Fourteenth Amendment and the Medicaid Act. The essence of her arguments, however, is more of an attack on the credibility of DDSN's final decision, not that DDSN engaged in retaliatory conduct.

---

**22.** Although Doe was the party who brought the case before the hearing officer, DDSN presented its evidence first January 24–26, 2006, and Doe presented her case April 27–28, 2006.

**23.** Doe filed a lawsuit alleging violations of the Medicaid Act, Americans with Disabilities Act, and various state laws against DDSN, HHS, and certain state officials. *Doe I,* 501 F.3d at 352. *Doe I* disposed of Doe's claim regarding her freedom of choice of providers. *Id.* at 358–60. The Fourth Circuit subsequently disposed of her remaining argument that DDSN violated her civil rights by not providing her residential services with reasonable promptness. *Doe v. Kidd,* 419 Fed.Appx. 411, 415–17 (4th Cir.2011) (*Doe II*). *Doe II* has no impact on our decision in this case as the Fourth Circuit specifically left open the issues regarding Doe's eligibility and retaliation claims for us to consider. *Id.* at 420–21.

Because I have already resolved that issue, I find no error in rejecting this claim.

## III.

The case before us is the culmination of a long and contentious dispute regarding one young woman's eligibility for certain Medicaid benefits. Throughout this process, tensions have flared as the parties have engaged in a vigorous dispute over some very complicated and emotionally-charged issues. At the center of all of this is a now twenty-eight-year-old woman with undeniable cognitive and adaptive deficits. After a review of the regulations concerning the labyrinthine Social Security and Medicaid Acts, I agree there is no rule requiring states to be bound by the federal government's disability determination or the SSI definition of mental retardation. I believe there is an express policy of granting states wide latitude in designing and implementing programs to best meet their needs and the needs of the target population. Where I part company with the majority, however, is with respect to whether South Carolina has adopted a different definition of mental retardation. In my opinion, DDSN acted within its authority in adopting its present definition and would apply it in this case.

As to Doe's remaining arguments, based on our standard of review, I would find the hearing officer's determination that Doe does not suffer from mental retardation or a related disability is supported by substantial evidence. In administrative appeals, this Court does not make findings of fact or weigh evidence; we sit only to ensure that the findings below are supported by substantial evidence and are not arbitrary, capricious, or an abuse of discretion. As discussed, both parties presented copious evidence of the nature and extent of Doe's conditions. Accordingly, it was the job of the hearing officer to make this incredibly close factual call. Simply because reasonable minds may disagree with the result does not make it unsupported by substantial evidence or arbitrary or capricious. I also believe the hearing officer did not commit any errors of law. Therefore, I would affirm the order of the ALC.

PLEICONES, J., concurs.