763 S.E.2d 638

Richard STOGSDILL, Appellant,

v.

SOUTH CAROLINA DEPARTMENT OF HEALTH
AND HUMAN SERVICES, Respondent.

Appellate Case No. 2013–000762.

No. 5271.

Court of Appeals of South Carolina.

Heard March 12, 2014.

Decided Sept. 10, 2014.

Rehearing Denied Oct. 23, 2014.

Patricia Logan Harrison, of Columbia, for Appellant.

Richard G. Hepfer, of South Carolina Department of Health and Human Services, of Columbia, for Respondent.

Anna Maria Darwin and Sarah Garland St. Onge, of Columbia, for Amicus Curiae, Protection and Advocacy for People With Disabilities, Inc., Amy Landers May, of Columbia, for Amicus Curiae, the South Carolina Chapter of the National

Academy of Elder Law Attorneys, Kirby Mitchell, of Greenville, for Amicus Curiae, South Carolina Legal Services, of Greenville, and Stephen Suggs, of Columbia, for Amicus Curiae, the South Carolina Appleseed Legal Justice Center.

KONDUROS, J.

Richard Stogsdill appeals the Administrative Law Court's (ALC's) order affirming the South Carolina Department of Health and Human Services' (DHHS's) decision approving the reduction in services to him. We affirm in part, reverse in part, and remand.

**FACTS/PROCEDURAL HISTORY**

Stogsdill is a Medicaid-eligible man receiving services under the South Carolina Intellectual Disabilities/Related Disabilities (ID/RD) Waiver (Waiver).[1] His mental capacity is normal, but because of premature birth, he suffers from significant physical disabilities that require aid in nearly every activity of daily living. Under the Waiver, the South Carolina Department of Disabilities and Special Needs (DDSN) beneficiaries can be provided a mix of services. Waivers permit eligible recipients to receive these services without the requirement of institutionalization. On January 1, 2010, the five-year renewal of the Waiver went into effect. The renewed Waiver included a cap or limit on some services and excluded others. DHHS administers the state Medicaid program and is responsible for the overall administration of the Waiver. DDSN is responsible for the day-today operation of the Waiver.

Prior to the Waiver changes, Stogsdill was receiving a combined sixty-nine hours of Personal Care Aide (PCA) and Companion Care services per week and approximately thirty-six hours of Respite Care per week. PCA services consist of hands-on personal care that the person needs to accomplish his or her activities of daily living such as bathing, toileting, dressing, and eating. Companion Care services are similar to PCA services but include an aspect of community integration. Respite Care can be a range of services, including personal care but is designed to provide services when the normal caregiver is absent or needs relief.

---

1. This is the former Mentally Retarded/Related Disabilities (MR/RD Waiver).

The Waiver capped any combination of PCA and Companion Care services at twenty-eight hours per week. The normal cap for Respite Services is sixty-eight hours per month, approximately sixteen hours per week, but exceptions can be granted for up to 240 hours per month, approximately fifty-six hours per week. Under these new limits, Stogsdill's services were reduced to twenty-eight hours per week of all PCA services, including Companion Care services, and sixty-eight monthly hours of Respite Care. After an application by his Service Coordinator, Stogsdill's Respite Care hours were increased to 172 hours per month. His occupational therapy and speech therapy were discontinued. Stogsdill appealed the reduction in services through the administrative process finally ending with the ALC affirming the reduction in services. This appeal followed.

## STANDARD OF REVIEW

"The Administrative Procedures Act (APA) establishes the standard of review for appeals from the ALC." *Greeneagle, Inc. v. S.C. Dep't of Health & Envtl. Control,* 399 S.C. 91, 95, 730 S.E.2d 869, 871 (Ct.App.2012), *cert. pending.*

> The court of appeals may affirm the decision or remand the case for further proceedings; or, it may reverse or modify the decision if the substantive rights of the petitioner have been prejudiced because the finding, conclusion, or decision is:
>
> (a) in violation of constitutional or statutory provisions;
>
> (b) in excess of the statutory authority of the agency;
>
> (c) made upon unlawful procedure;
>
> (d) affected by other error of law;
>
> (e) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
>
> (f) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

S.C.Code Ann. § 1–23–610(B) (Supp.2013).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. When determining whether the record contains substantial evidence to support an administrative agency's findings [the

appellate court] cannot substitute its judgment on the weight of the evidence for that of the agency." *S.C. Dep't of Mental Health v. Moore*, 295 S.C. 42, 45, 367 S.E.2d 27, 28 (1988) (citations and internal quotation marks omitted). "Substantial evidence is not a mere scintilla of evidence, nor the evidence viewed blindly from one side of the case, but is evidence that, considering the record as a whole, would allow reasonable minds to reach the conclusion the administrative agency reached in order to justify its action." *Fragosa v. Kade Constr., LLC*, 407 S.C. 424, 428, 755 S.E.2d 462, 465 (Ct.App. 2013) (internal quotation marks omitted).

## LAW/ANALYSIS

### I. Lawfulness of Reduction in Waiver Services

Stogsdill maintains the ALC and DHHS erred as a matter of law in concluding the 2010 caps were "lawful" based solely on the federal agency, Center for Medicare and Medicaid Services (CMS), approving them. Stogsdill contends the changes do not carry the force and effect of law because they were not passed as regulations pursuant to the APA. We disagree.

" 'Regulation' means each agency statement of general public applicability that implements or prescribes law or policy or practice requirements of any agency. Policy or guidance issued by an agency other than in a regulation does not have the force or effect of law." S.C.Code Ann. § 1–23–10(4) (2005).

[W]hether an agency's action or statement amounts to a rule—which must be formally enacted as a regulation—or a general policy statement—which does not have to be enacted as a regulation—depends on whether the action or statement establishes a binding norm. When the action or statement so fills out the statutory scheme that upon application one need only determine whether a given case is within the rule's criterion, then it is a binding norm which should be enacted as a regulation. But if the agency remains free to follow or not follow the policy in an individual case, the agency has not established a binding norm.

*Sloan v. S.C. Bd. of Physical Therapy Exam'rs*, 370 S.C. 452, 475–76, 636 S.E.2d 598, 610 (2006) (citations and internal quotation marks omitted).

We agree with Stogsdill that DDSN has established a binding norm by reducing the types and amount of services offered under the Waiver. The record presents no explanation for the reduction in services to Stogsdill other than the cap put in place by the 2010 Waiver renewal. However, based on the relevant statutory scheme and federal/state nature of Medicaid and the Waiver, DDSN was not required to pass a regulation to enact the cap as an enforceable provision.

South Carolina elected to participate in the Waiver Medicaid program in 1991. Pursuant thereto, the legislature created DDSN and designated it as the "state's intellectual disability, related disabilities, head injuries, and spinal cord injuries authority for the purpose of administering federal funds allocation to South Carolina." S.C.Code Ann. § 44–20–240,–270 (Supp.2013). Federal regulations set forth the manner in which Waiver requests and renewals are made and approved. The governor, the head of the state Medicaid agency, or an authorized designee may submit the Waiver request. 42 C.F.R. § 430.25(e) (2013). The request is then reviewed by CMS regional and central office staff who submit a recommendation to the CMS Administrator. 42 C.F.R. § 430.25(f)(2) (2013). The Administrator may approve or deny waiver requests, and a request is considered approved unless, within ninety days after the request is received by CMS, the Administrator denies the request or sends the State a written request for additional information needed to reach a final decision. 42 C.F.R. § 430.25(f)(2)(i), (3) (2013). No one disputes the 2010 Waiver was so approved.

In *Doe v. South Carolina Department of Health and Human Services,* 398 S.C. 62, 70, 727 S.E.2d 605, 609 (2011), the Supreme Court of South Carolina considered whether Doe could be denied Waiver services because DDSN had concluded her mental retardation did not onset prior to her eighteenth birthday. The court concluded DDSN could not terminate Doe's services because the pertinent regulation required the onset of disability prior to age twenty-two. *Id.* at 72–74, 727 S.E.2d at 610–11. In discussing the ways DDSN may control the target population for Waiver services, the court concluded:

> In sum, it is clear that South Carolina *could have* listed additional criteria in the waiver application for the purpose of defining the population to whom it would provide waiver

services. Likewise, DDSN *could have* promulgated regulations incorporating those additional criteria as part of the definition of mental retardation. But no such steps were taken. Rather, South Carolina adopted a broad definition of mental retardation in section 44–20–30, using language that parallels the [Supplemental Security Income] definition, and in Regulation 88–210, DDSN interpreted that definition in a manner consistent with the [Social Security Administration]. DDSN's interpretation of section 44–20–30 in its policy guidelines directly conflicts with Regulation 88–210 and should be disregarded.

*Id.* at 74, 727 S.E.2d at 611.

Additionally, in the dissent, Justice Hearn indicated "South Carolina can impose more restrictive criteria for mental retardation in its [W]aiver application or in a regulation." *Id.* at 75, 727 S.E.2d at 612 (Hearn, J., dissenting). While the ruling in *Doe* was not dependent on a determination that approval of the Waiver renewal by CMS created binding law, it suggests the State may make changes to its program through that process.

Moreover, we find a case from the North Carolina Court of Appeals to be analogous and instructive. In *Arrowood v. North Carolina Department of Health & Human Services,* 140 N.C.App. 31, 535 S.E.2d 585, 587 (2000) (*rev'd,* 353 N.C. 351, 543 S.E.2d 481 (2001)), NCDHHS sought a waiver from the federal government to implement its "Work First Program." *Id.* at 587. Under "Work First," a recipient signed a letter agreeing to a twenty-four-month limitation on public assistance. *Id.* After the twenty-four-month period expired, Arrowood sued arguing the limitation was not enforceable because it was not promulgated as a regulation under the state's APA. *Id.* at 587–88. The majority agreed, but the dissent was ultimately adopted by the North Carolina Supreme Court. *See Arrowood,* 543 S.E.2d at 481. The dissent determined the following:

42 U.S.C. § 1315 allows the Secretary of the United States Department of Health and Human Services (HHS) to waive requirements contained in 42 U.S.C. § 602 that pertain to state plans for Aid to Families with Dependent Children (AFDC) in cases of demonstration or pilot projects. On

September 14, 1995, Governor Hunt formally submitted a request for authority to operate a statewide welfare demonstration project, entitled *Work First*, to HHS. In April [of] 1996[,] HHS issued waiver authority to North Carolina to operate the *Work First* program. The waiver gave North Carolina authority to deny AFDC benefits to adults who had received AFDC for 24 months. North Carolina implemented the *Work First* program, including the 24–month time limit for benefits, in August [of] 1996. This waiver authority had the legal effect of superseding existing federal statutes that contain no such provision for time limiting benefits. G.S. 150B–19(4) prohibits an agency from adopting a rule that repeats the content of a law, rule, or federal regulation. The waiver authority cited above had the force and effect of federal law. Furthermore, it was sufficiently clear as to the provisions of the waiver authority. There was, therefore, no need for state regulation, and any such regulation would have been repetitive in violation of G.S. 150B–19.

*Arrowood,* 535 S.E.2d at 592–93 (Walker, J., dissenting).

■ Likewise, in this case, section 1915(c) of the Social Security Act, 42 U.S.C.A. § 1396n(c) (2012), enables states to request a waiver of applicable federal Medicaid requirements to provide enhanced community support services to those Medicaid beneficiaries who would otherwise require institutional care. *See also* 42 C.F.R. § 441.300 (2013) ("Section 1915(c) of the [Social Security] Act permits States to offer, under a waiver of statutory requirements, an array of home and community-based services that an individual needs to avoid institutionalization."). The State submitted its proposed Waiver, and it was approved by CMS. This Waiver authority had the legal effect of superseding existing federal statutes that would not allow for community-based services. The provisions of the Waiver are clear, and if "the State and the Federal regulations are not in agreement, the requirements of the Federal regulations shall prevail." S.C.Code Reg. 126–399 (2012). Based on all of the foregoing, we conclude approval by state regulation was not required to give the Waiver's provisions the force and effect of law. Consequently, we affirm the ALC's determination that the 2010 Waiver caps are lawful.

## II. Notice and Due Process

Next, Stogsdill contends his due process rights were violated because he did not receive adequate notice of the reduction in services. We disagree.

42 C.F.R. § 431.210 (2013) address the content of notices regarding changes in the Waiver program.

A notice required under § 431.206(c)(2), (c)(3), or (c)(4) of this subpart must contain—

(a) A statement of what action the State, skilled nursing facility, or nursing facility intends to take;

(b) The reasons for the intended action;

(c) The specific regulations that support, or the change in Federal or State law that requires, the action;

(d) An explanation of—

(1) The individual's right to request an evidentiary hearing if one is available, or a State agency hearing; or

(2) In cases of an action based on a change in law, the circumstances under which a hearing will be granted; and

(e) An explanation of the circumstances under which Medicaid is continued if a hearing is requested.

*Id.*

In this case, precisely what notice Stogsdill received regarding the reduction in his services is unclear. The record on appeal does not include any notice, but the ALC's order indicates "a general notice was sent out to all DDSN clients notifying them of the *pending* changes and encouraged those affected to work with DDSN Service Coordinators (case managers) to mediate the impact of the new service limits." While such notice would fall short of the requirements of § 431.210, Stogsdill cites to no authority suggesting that this failure, in the absence of prejudice, requires any action. *See Palmetto Alliance, Inc. v. S.C. Pub. Serv. Comm'n,* 282 S.C. 430, 435, 319 S.E.2d 695, 698 (1984) (stating "proof of a denial of due process in an administrative proceeding requires a showing of substantial prejudice"); *see also Jones v. S.C. Dep't of Health & Envtl. Control,* 384 S.C. 295, 317, 682 S.E.2d 282, 294 (Ct.App.2009) (finding the plaintiffs' due process claim failed when they received notice of the agency action enabling them

to obtain a hearing before the ALC providing them the opportunities required by due process).

The record demonstrates Stogsdill has fully exercised his opportunity for a hearing and judicial review. As a result, we affirm the ALC's ruling that Stogsdill's due process rights were not violated.[2]

## III. Risk of Institutionalization

Having determined the 2010 caps were lawful and that Stogsdill's due process rights were not violated by the inadequacy of DHHS's notice, we turn to the question of whether the application of the caps to his case violates the Americans with Disabilities Act (ADA) as set forth in *Olmstead v. L.C. ex rel Zimring*, 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999). Stogsdill argues the ALC erred in finding his risk of institutionalization was "speculative" when it considered the reduction in his services. We agree.

In *Olmstead*, the plaintiffs were institutionalized women suffering from intellectual disability and mental illness. *Id.* at 593, 119 S.Ct. 2176. They sought community-based care. *Id.* at 593–94, 119 S.Ct. 2176. The United States Supreme Court concluded requiring the plaintiffs to be institutionalized and segregated from the population at large discriminated against them in violation of the ADA. *Id.* at 599–602, 119 S.Ct. 2176. Therefore, treatment for disabilities is to be provided in the most integrated, least restrictive setting possible. *Id.* at 602 n. 13, 119 S.Ct. 2176; *see also* 28 C.F.R. § 35.130(d) (2013) ("A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.").

A number of cases have followed in which Medicaid Waiver recipients protested the elimination of or reduction in their services, arguing the cuts put them at risk of institutionalization in violation of the ADA's integration mandate as inter-

---

2. While we observe Stogsdill suffered no prejudice in this case based on the inadequate notice of proposed changes, we do not condone DHHS's apparent failure to comply with 42 C.F.R. § 431.210 as this regulation is in place to ensure affected recipients have the fullest and fairest opportunity to exercise their rights.

preted by *Olmstead*.[3] *See M.R. v. Dreyfus*, 697 F.3d 706, 734–35 (9th Cir.2012) (granting injunction to plaintiffs opposing reduction in personal care hours as violative of the ADA and indicating "the elimination of services that have enabled [a plaintiff] to remain in the community violates the ADA, regardless of whether it causes them to enter an institution immediately, or whether it causes them to decline in health over time and eventually enter an institution in order to seek necessary care"); *Radaszewski ex rel. Radaszewski*, 383 F.3d 599, 614–15 (7th Cir.2004) (reversing judgment on the pleadings in favor of agency when plaintiff had potential claim for disallowing twenty-four-hour nursing care that would allow benefit recipient to continue living at home); *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1181–82 (10th Cir.2003) (holding cap on prescription drug coverage for plaintiffs in community-based Medicaid program did not require institutionalization as prerequisite for bringing ADA claim and claim was stated because plaintiffs would be denied service they could receive if they submitted to institutionalization); *but see Rodriguez v. City of New York*, 197 F.3d 611, 619 (2nd Cir.1999) (denying injunction to plaintiffs seeking safety monitoring to remain in community setting and stating "*Olmstead* does not, therefore, stand for the proposition that states must provide disabled individuals with the opportunity to remain out of institutions. Instead, it holds only that 'States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide' ").

The Fourth Circuit addressed this issue in *Pashby*, 709 F.3d at 321–325. Therein, the court affirmed the grant of a preliminary injunction that would prevent the elimination of in-home services to plaintiffs because that action placed plaintiffs at risk of institutionalization in violation of the ADA's antidis-

---

3. We note there is some discord regarding the extent of the integration mandate in *Olmstead*. The controlling precedent for this case, *Pashby v. Delia*, 709 F.3d 307 (4th Cir.2013), is a 2–1 opinion wherein the dissent states, "North Carolina is not required to maintain any particular level of care to prevent the [plaintiffs] from entering an institution." *Id.* at 335 (Agee, J., dissenting). *M.R. v. Dreyfus*, 697 F.3d 706, 734–35 (9th Cir.2012) is also a 2–1 opinion wherein the dissent found plaintiffs failed to meet the burden of demonstrating their claims would succeed on the merits when plaintiffs were not facing immediate threat of institutionalization. *Id.* at 741–42 (Rawlinson, J., dissenting).

crimination policy. *Id.* at 321–24. In concluding the plaintiffs established a sufficient risk of institutionalization to succeed on the merits of their claim, the court found interested parties in the case declared the plaintiffs "could not live on their own without in-home PCS [personal care services] or that it would be unsafe for them to do so. Each of these declarants also attested that the [plaintiffs] had no friends or family members who could offer the same amount of care that their aides provided under the in-home PCS program." *Id.* at 322. Additionally, all but two of the declarants indicated the plaintiffs " 'may,' 'might,' 'probably' would, or were 'likely' to [face institutionalization] due to the termination of their in-home PCS." *Id.*

In this case, Stogsdill has provided the uncontradicted opinions of his treating physician, Dr. Thomas C. Joseph, and Lennie S. Mullis, a psychologist with DDSN, indicating the reduction in his services places him at risk of institutionalization. Both Stogsdill and his mother testified the reduction in services would place him at risk of institutionalization. This quantum of proof far exceeds that offered by the plaintiffs in *Pashby.*

Additionally, we recognize attending a sheltered workshop may be an option for Stogsdill that could substitute for some of the reduction in his service hours. However, the record reflects he will have little interaction with other individuals who are not intellectually disabled, a situation that causes him great fear and anxiety. Furthermore, Stogsdill's physical limitations would place him in a vulnerable position with respect to other workshop participants who may not suffer from his level of physical disability, and it is unclear whether the required medical care would be available to him in this setting. Mullis attested a sheltered workshop would not be an appropriate placement for Stogsdill for psychological reasons, and Dr. Joseph agreed with her assessment.[4] DHHS has

---

4. Mullis indicated "[a] combination of adult companion services, personal care services and respite services are needed to protect [Stogsdill's] health and welfare and to provide respite so that his parents can continue to provide support in his home to delay institutionalization." Dr. Joseph attested "[Stogsdill] would be at risk of institutionalization if the needed home-based services are not provided."

presented no probative evidence contrary to the conclusion that the reduction in services poses a risk of institutionalization. Based on the substantial evidence in the record, we reverse the ALC's conclusion that Stogsdill's risk of institutionalization was speculative.[5]

## IV. Fundamental Alteration

■ Stogsdill next contends the ALC erred in concluding DHHS met its burden as set forth in *Olmstead* of proving that accommodating his needed services would force the State to fundamentally alter the nature of its program. We agree.

The *Olmstead* court recognized a state may have a defense to accommodating a Waiver participant's needs if doing so would present a fundamental alteration to its program. *Olmstead*, 527 U.S. at 603–04, 119 S.Ct. 2176. "The reasonable-modifications regulation speaks of 'reasonable modifications' to avoid discrimination, and allows States to resist modifications that entail a 'fundamenta[l] alter[ation]' of the States' services and programs." *Id.* at 603, 119 S.Ct. 2176 (quoting 28 C.F.R. § 35.130(b)(7) (1998)). In evaluating North Carolina's fundamental alteration defense, the *Pashby* court held: "budgetary concerns do not alone sustain a fundamental alteration defense. . . . We join the Third, Ninth, and Tenth Circuits in holding that, although budgetary concerns are relevant to the fundamental alteration calculus, financial constraints alone cannot sustain a fundamental alteration defense." *Pashby*, 709 F.3d at 323–24 (internal quotation marks omitted).

Our review of the record reveals no argument other than a general budgetary reduction and financial constraints as the basis for DHSS's fundamental alteration defense. Therefore,

---

**5.** As a subpart of his risk of institutionalization argument, Stogsdill contends the ALC failed to give Dr. Joseph's opinion the "greatest deference" required under Justice Kennedy's concurrence in *Olmstead*. Because we determine the record contains substantial evidence to support Stogsdill's risk of institutionalization argument, we need not address this issue. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (recognizing an appellate court need not address an issue when resolution of a prior issue is dispositive).

we reverse the ALC's finding that providing the requested services to Stogsdill would result in a fundamental alteration of the Waiver program. We remand this case to DDSN for an assessment of required hours and services without reference to the caps in the Waiver.

## CONCLUSION[6]

We hold the caps included in the Waiver were not required to be promulgated as regulations to carry the force and effect of law, and Stogsdill was not denied due process by DHHS's inadequate notice in the absence of prejudice. Nevertheless, we find the substantial evidence in the record did not support the ALC's determination that Stogsdill's risk of institutionalization was merely speculative, and we conclude, under *Pashby*, DHHS failed to establish a fundamental alteration defense. Consequently, Stogsdill's case is remanded for consideration of the appropriate services to be provided without the restrictions of the 2010 Waiver. Therefore the order of the ALC is

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

WILLIAMS and LOCKEMY, JJ., concur.

---

6. Stogsdill makes a lengthy argument regarding the separation of powers in his brief. However, this issue was neither raised to nor ruled upon by DHHS or the ALC. Therefore, it is not preserved for appellate review. *See Staubes v. City of Folly Beach*, 339 S.C. 406, 412, 529 S.E.2d 543, 546 (2000) ("[A]n issue cannot be raised for the first time on appeal, but must be raised to and ruled upon by the trial court to be preserved for appellate review."). Additionally, we decline to address Stogsdill's remaining arguments regarding reasonable promptness and comparability as they are not necessary to the disposition of the case. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding an appellate court need not address any remaining issues if the determination of a prior issue is dispositive).