**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 14-1428**

---

SUE DOE,

                    Plaintiff - Appellant,

          v.

LINDA KIDD; STAN BUTKUS; KATHI LACY; SOUTH CAROLINA
DEPARTMENT OF DISABILITIES AND SPECIAL NEEDS; ROBERT KERR;
SOUTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES,

                    Defendants – Appellees,

          v.

SANDRA RAY,

                    Party-in-interest.

---

**No. 14-1429**

---

SUE DOE,

                    Plaintiff - Appellee,

          v.

LINDA KIDD; STAN BUTKUS; KATHI LACY; SOUTH CAROLINA
DEPARTMENT OF DISABILITIES AND SPECIAL NEEDS; SOUTH CAROLINA
DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT KERR,

                    Defendants – Appellants,

          v.

SANDRA RAY,

              Party-in-interest.

---

**No. 15-1022**

---

SUE DOE,

              Plaintiff - Appellant,

        v.

LINDA KIDD; STAN BUTKUS; KATHI LACY; SOUTH CAROLINA DEPARTMENT OF DISABILITIES AND SPECIAL NEEDS; ROBERT KERR; SOUTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES,

              Defendants – Appellees,

        v.

SANDRA RAY,

              Party-in-interest.

---

**No. 15-1024**

---

SUE DOE,

              Plaintiff - Appellee,

        v.

LINDA KIDD; STAN BUTKUS; KATHI LACY; SOUTH CAROLINA DEPARTMENT OF DISABILITIES AND SPECIAL NEEDS; SOUTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT KERR,

              Defendants – Appellants,

        v.

SANDRA RAY,

                   Party-in-interest.

                        ———————————

                         **No. 15-1026**

                        ———————————

SUE DOE,

                   Plaintiff - Appellant,

          v.

LINDA KIDD; STAN BUTKUS; KATHI LACY; SOUTH CAROLINA
DEPARTMENT OF DISABILITIES AND SPECIAL NEEDS; ROBERT KERR;
SOUTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES,

                   Defendants – Appellees,

          v.

SANDRA RAY,

                   Party-in-interest.

                        ———————————

Appeals from the United States District Court for the District
of South Carolina, at Columbia.   Margaret B. Seymour, Senior
District Judge.  (3:03-cv-01918-MBS)

                        ———————————

Argued:  January 27, 2016          Decided:  August 9, 2016

                        ———————————

Before GREGORY, Chief Judge, and KING and WYNN, Circuit Judges.

                        ———————————

Vacated and remanded by unpublished opinion.  Chief Judge
Gregory wrote the opinion, in which Judge King and Judge Wynn
joined.

                        ———————————

**ARGUED**:  Armand G. Derfner, DERFNER & ALTMAN, LLC, Charleston,
South Carolina; Patricia L. Harrison, PATRICIA LOGAN HARRISON

3

ATTORNEY AT LAW, Columbia, South Carolina, for Appellant/Cross-Appellee.  Kenneth Paul Woodington, DAVIDSON & LINDEMANN, P.A., Columbia, South Carolina, for Appellees/Cross-Appellants.  **ON BRIEF**: William H. Davidson, II, DAVIDSON & LINDEMANN, P.A., Columbia, South Carolina, for Appellees/Cross-Appellants.

---

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Chief Judge:

This is an appeal and cross-appeal of an award of attorneys' fees in a civil rights action brought by Sue Doe, a young woman with developmental disabilities, including epilepsy, mild intellectual disability, and cerebral palsy. She filed this 42 U.S.C. § 1983 action against the South Carolina Department of Disabilities and Special Needs ("DDSN"), the South Carolina Department of Health and Human Services ("DHHS"), as well as Linda Kidd, Stan Butkus, Kathi Lacy, and Robert Kerr, in their official capacities as state administrators (collectively, "defendants"). The suit alleged that the defendants violated various sections of the Medicaid Act related to the provision of services.

This case has been before this Court on two previous occasions. In Doe v. Kidd, 501 F.3d 348 (4th Cir. 2007) [hereinafter "Doe I"], this Court reversed the district court's summary judgment finding in favor of the defendants, holding that § 1396a(a)(8) of the Medicaid Act creates a private right of action that is enforceable through § 1983. 501 F.3d at 356. In Doe v. Kidd, 419 F. App'x 411 (4th Cir. 2011) (unpublished) [hereinafter "Doe II"], this Court again reversed the district court's summary judgment finding in favor of the defendants, holding that, as a matter of law, the defendants failed to comply with the Medicaid Act "through their ongoing refusal to

5

finance residential habilitation services at an acceptable . . . placement to" Doe.  419 F. App'x at 418.  This Court further held that Doe was "the prevailing party, [and] she is entitled to attorney's fees."  Id.

Despite two successful appeals, the district court significantly reduced Doe's request for attorneys' fees, guardian ad litem fees, and costs, finding, among other things, that there "ha[d] been no change in the status quo."  J.A. 2300. Because this finding, and others, were clearly wrong, we vacate the attorneys' fee award and direct entry for an award of $669,077.20, exclusive of costs; we vacate the guardian ad litem fee award and direct entry for an award of $39,173.75; and we remand for further proceedings consistent with this opinion.

I.

A.

The basic history of this case is laid out in further detail in Doe I and Doe II.  Below is a brief summary of the facts.

Medicaid is an optional, federal-state program through which the federal government provides financial assistance to states for the medical care of needy individuals.  Wilder v. Va. Hosp. Ass'n, 496 U.S. 498, 502 (1990).  Once a state elects to participate in the program, it must comply with all federal

Medicaid laws and regulations.  Id.  DHHS is the state agency responsible for administering and supervising Medicaid programs in South Carolina.  DDSN has specific authority over the state's treatment and training programs for people with intellectual disability.

This case involved the Medicaid waiver program created by 42 U.S.C. § 1396n(c), which permits states to waive the requirement that persons with intellectual disability or a related disability live in an institution in order to receive certain Medicaid services.  See generally Bryson v. Shumway, 308 F.3d 79, 82 (1st Cir. 2002) ("[The program] allow[s] states to experiment with methods of care, or to provide care on a targeted basis, without adhering to the strict mandates of the Medicaid system.").  When an individual in South Carolina applies for DDSN services, including the waiver program, DHHS is required to make certain determinations.

The waiver application process has three steps:  first, DHHS needed to decide whether Doe was eligible for any Medicaid funding; next, DDSN was required to evaluate Doe to determine what services she was entitled to; and, finally, DDSN had to decide the most appropriate "level of care" for Doe as well as the least restrictive environment or care setting.  Doe I, 501 F.3d at 351.  These settings may include, listed in order of the least to the most restrictive placement (1) a Supervised Living

7

Program II ("SLP II"), an apartment where recipients of DDSN services reside together; (2) a Community Training Home I ("CTH I"), a private foster home where a services recipient resides with a family, one member of which is a trained caregiver; or (3) a Community Training Home II ("CTH II"), a group home with live-in caregivers for four or fewer recipients. Id. at 351-52. Appeals from DDSN decisions are taken to a DHHS hearing officer and thereafter may be appealed to a South Carolina administrative law judge.

In December 2002, without having made a final decision as to Doe's eligibility for a waiver, DDSN placed Doe on the waiver program's noncritical waiting list. Doe appealed this decision to DHHS, and claimed that DDSN had failed to provide her with services within a reasonably prompt time frame as required by federal regulations. Pending that appeal, DDSN moved Doe to its critical waiting list in February 2003. Doe was advised that she met certain DDSN eligibility requirements in March 2003. She was then moved to the top of the critical waiting list.

At a March 2003 hearing on the appeal, a DHHS hearing officer dismissed the matter. He found that, by moving Doe to the top of the critical waiting list and determining that she was eligible for services, DDSN had resolved all of Doe's claims in her favor. The hearing officer also found that DDSN had not provided Doe with services in a "reasonably prompt" period of

8

time. However, because DDSN was then promising to provide Doe with services, the hearing officer found that he lacked the power to provide any other relief and the appeal was dismissed.

In April 2003, DDSN approved a "plan of care" that was developed for Doe pursuant to 42 C.F.R. § 441.301(b) ("2003 plan"). The 2003 plan included a regime of personal care, psychological evaluations, and other services to be provided in-home at the residence of Doe's mother. It also recommended that Doe "receive residential habilitation from a DDSN approved provider" within three months at a "setting located within the Columbia area to be chosen by her family." Doe II, 419 F. App'x at 414.

In May 2003, in response to the declining mental health of Doe's mother, Doe asked to terminate the in-home services and, per the 2003 plan, receive "residential habilitation services" in either a CTH I or CTH II. In June 2003, after failing to receive any residential habilitation services, Doe initiated this action, wherein she accused the defendants of violating the Medicaid Act. She sought injunctive relief from DDSN, the payment of medical expenses, and attorneys' fees.

In a letter dated June 26, 2003, DDSN authorized CTH I or SLP II services for Doe at a residential center (the "authorization letter"). According to the authorization letter, an assessment of Doe by DDSN revealed that her needs for "out-

9

of-home placement/residential habilitation supervision, care and skills training" could be met at either of these two placements. However, Doe rejected the DDSN chosen provider, the Babcock Center, because she believed that the facility could not safely provide her with appropriate services. Through August 2003, the defendants and Doe discussed some alternative placements, including the possibility of upgrading the services at another CTH I setting or placement at a CTH II facility closer to her family. The defendants maintained that a CTH I setting "represent[ed] the best long-term option" for Doe. Id. at 414.

In an August 16, 2003 letter, DDSN gave Doe permission to reside in a CTH II facility, where she would receive "respite" or temporary services. The defendants contended that it provided Doe with CTH II placement because of Doe's family circumstances, not because she was qualified for the most-restrictive setting; in fact, DDSN found Doe to need a CTH I (foster home) or SLP II (apartment) setting.

In February 2005, DDSN reevaluated Doe's eligibility for Medicaid services. Based on this reevaluation, DDSN maintained that Doe was not intellectually disabled and, therefore, is ineligible for the waiver program. According to Doe, the reevaluation was initiated in retaliation for her filing of this lawsuit. She also believes it contradicts the Social Security Administration's prior determination that Doe is intellectually

10

disabled and the similar longstanding diagnosis of Doe's physicians. Doe administratively appealed this reevaluation. However, both a DHHS hearing officer and a state administrative law court judge agreed with DDSN. See generally Doe v. S.C. Dep't of Health and Human Servs., No. 06-ALJ-08-0605-AP, 2008 WL 2828634 (S.C. Admin. L. Ct. June 20, 2008). Doe appealed.

While Doe's appeals concerning her eligibility for waiver services under the Medicaid Act were proceeding in state court, this Court heard two separate appeals. In Doe I, this Court recognized for the first time that § 1396a(a)(8) unambiguously conferred rights enforceable under § 1983. In other words, Doe was entitled to proceed under § 1983 to assert her right to receive services with reasonable promptness. Thus, this Court remanded to the district court the issue of whether Doe had received, with reasonable promptness, the services authorized by DDSN in the 2003 plan. On remand, the district court granted summary judgment in favor of the defendants on the reasonable promptness issue, holding that the defendants offered Doe with CTH I services in June 2003, but she rejected those services. Doe appealed.

In Doe II, this Court held, as a matter of law, that the "defendants have violated the Medicaid Act through their ongoing refusal to finance residential habilitation services at an acceptable CTH I placement of [Doe's] choice." 419 F. App'x at

11

421. This Court further held that, "given the defendants' continuing violations of the timeliness provisions of the Medicaid Act and its regulations, they are ordered to provide Doe with services in a SLP II or CTH I facility of her choice (at least pending the outcome of her state appeal)." Id. (emphasis added). This Court reasoned that after Doe rejected the CTH I services offered in June 2003, the defendants were still obligated to present her with alternative CTH I services within a reasonably prompt period of time. Id. Because this Court reversed the district court, and directed it to grant summary judgment in her favor, we found that there could "be no question that Doe is the 'prevailing party' for purposes of § 1988. She is therefore entitled to reasonable attorney's fees as determined by the district court." Id. at 420.

After Doe II, the defendants - for well over two years - did not provide Doe with CTH I or SLP II possible placements in order for Doe to decide which facility best suited her needs. In fact, the district court determined that the defendants did not comply with this Court's order - or the Medicaid Act - until August 2013, a full two and a half years after Doe II was decided. J.A. 2300.

During this same time period, Doe's counsel presented several possible placements to the defendants that the defendants rejected on the basis that Doe was either seeking a

12

CTH II placement or additional accommodations inconsistent with a "true" SLP II placement, such as twenty-four hours supervision. Unable to reach an agreement, Doe's counsel filed a motion for remedial relief with the district court. On August 12, 2013, the district court ordered that the defendants provide Doe with a list of all potential qualified SLP II or CTH I placements every fourteen days until Doe's state administrative process is exhausted or Doe accepts a placement, whichever comes first. The defendants complied with this order.

In December 2011, some months after the decision of Doe II, the Supreme Court of South Carolina held that the DHHS hearing officer in the Medicaid eligibility proceeding should have applied a different legal standard under state law about the latest possible age of onset of intellectual disability. Doe v. S.C. Dep't of Health and Human Servs., 727 S.E.2d 606 (S.C. 2011). Thus, the court remanded to the hearing officer to determine eligibility under the correct legal standard. Thereafter, the hearing officer in late 2013 issued an order finding that Doe was "mentally retarded after the age of eighteen years and prior to the age of twenty-two years." J.A. 2285. The order further held that the agencies were to determine the appropriate level of care. Id. Neither party appealed. As a result of the state administrative decisions in 2014, DDSN authorized residential habilitation services in such

13

facilities as a CTH II.  Consequently, this case became moot, as Doe was provided proper accommodations in a CTH II facility.

B.

On August 28, 2013, Doe's counsel filed a motion for attorneys' fees.  After filing an amended fee petition, Doe sought $1,868,958 in attorneys' fees, of which $997,489 represented time expended in the state litigation and $871,469 represented time expended in the federal litigation.  Doe also sought $19,742,54 in costs and $59,018.75 in fees for the guardian ad litem.  After applying the framework set forth in Robinson v. Equifax Info. Servs., LLC, 560 F.3d 235 (4th Cir. 2009), the district court determined that Doe's efforts in the state litigation were not compensable under § 1988 and that Doe was entitled to $100,000 in attorneys' fees, $5,523.13 in costs, and $3,750 in guardian ad litem fees for the federal litigation.

Both parties timely appealed.  We possess jurisdiction pursuant to 28 U.S.C. § 1291.

II.

We review for abuse of discretion a district court's award of attorneys' fees, but we will only reverse such an award if the district court is "clearly wrong" or has committed an "error of law."  Brodziak v. Runyon, 145 F.3d 194, 196 (4th Cir. 1998) (citations omitted); see also Mercer v. Duke Univ., 401 F.3d

14

199, 203 (4th Cir. 2005) ("A district court's decision to grant or deny attorney's fee[s] under section 1988 is reviewed for abuse of discretion.").

III.

The general rule in our legal system is that each party must pay its own attorneys' fees and expenses, see Hensley v. Eckerhart, 461 U.S. 424, 429 (1983), but Congress enacted 42 U.S.C. § 1988 to ensure that federal rights are adequately enforced. Specifically, Congress "found that the private market for legal services failed to provide many victims of civil rights violations with effective access to the judicial process." City of Riverside v. Rivera, 477 U.S. 561, 576 (1986) (citations omitted). "Congress attributed this market failure in part to the fact that '[t]hese victims ordinarily cannot afford to purchase legal services at the rates set by the private market.'" Lefemine v. Wideman, 758 F.3d 551, 555 (4th Cir. 2014) (quoting City of Riverside, 477 U.S. at 576).

"Section 1988 provides that a prevailing party in certain civil rights actions may recover 'a reasonable attorney's fee as part of the costs.'" Perdue v. Kenny, 559 U.S. 542, 550 (2010). Unfortunately, Congress did not explain what it meant by "'reasonable' fee, and therefore the task of identifying an appropriate methodology for determining a 'reasonable' fee was

15

left for the courts." Id. In Perdue, the Supreme Court concluded that "a 'reasonable fee' is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case." Id. at 552; see also Pennsylvania v. Del. Valley Citizens' Council for Clean Air, 478 U.S. 546, 565 (1986) ("[I]f plaintiffs . . . find it possible to engage a lawyer based on the statutory assurance that he will be paid a 'reasonable fee,' the purpose behind the fee-shifting statute has been satisfied."). The aim of § 1988, therefore, is to enforce the covered civil rights statutes, not to provide "'a form of economic relief to improve the financial lot of attorneys.'" Perdue, 559 U.S. at 552 (quoting Del. Valley, 478 U.S. at 565).

The proper calculation of a reasonable attorneys' fee award involves a three-step process. First, the court must "determine [the] lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate." Robinson, 560 F.3d at 243. To ascertain what is reasonable in terms of hours expended and the rate charged, the court is bound to apply the factors set forth in Johnson v. Georgia Highway Express Inc., 488 F.2d 714, 717–19 (5th Cir. 1974).[1] Id. at 243–44. Next, the court

_____

[1] We have characterized the twelve Johnson factors as follows: (1) The time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to (Continued)

16

must "subtract fees for hours spent on unsuccessful claims unrelated to successful ones." Id. at 244. Finally, the court should award "some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff." Id. The district court erred on all three steps, particularly the third step, as it understated Doe's success.

A.

As a preliminary matter, the defendants contend that the only reasonable award of attorneys' fees in this case is an award of no fees at all. We disagree.

In Doe II, this Court determined that, in light of our holding that the defendants continued to violate the timeliness provisions of the Medicaid Act, "there can be no question that Doe is the 'prevailing party' for purposes of § 1988." 419 F. App'x at 420. This conclusion, however, means only that Doe is

---

properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases. See Barber v. Kimbrell's Inc., 577 F.2d 216, 226 n.28 (4th Cir. 1978) (adopting twelve factors for determining the reasonableness of attorneys' fees that Fifth Circuit identified in Johnson).

17

eligible for, rather than entitled to, an award of attorneys' fees. See Mercer, 401 F.3d at 203. Although Doe is a prevailing party, the district court has discretion to determine what constitutes a reasonable fee, a determination that requires the court to consider the extent of the plaintiff's success. See Farrar v. Hobby, 506 U.S. 103, 114 (1992) ("Once civil rights litigation materially alters the legal relationship between the parties, the degree of the plaintiff's overall success goes to the reasonableness of a fee award . . . ." (internal quotation marks omitted)). If the prevailing party has recovered only nominal damages or their success is purely technical or de minimis, the Supreme Court has explained that "the only reasonable fee is usually no fee at all." Id. at 115.

In Mercer, we set forth three factors for courts to consider in distinguishing cases in which the only reasonable attorney fee award is no attorney fees. The Mercer factors include: (1) the extent of relief sought compared to the relief obtained; (2) the significance of the legal issues on which the plaintiff prevailed; and (3) whether the litigation served a public purpose. Mercer, 401 F.3d at 204. All three factors easily weigh in favor of an award of attorneys' fees to Doe.

As for the first factor, Doe, since the inception of this case, claimed that the defendants violated the Medicaid Act by providing her with temporary respite services instead of

18

providing her, with reasonable promptness, the residential habilitation services approved in her 2003 plan of care. This Court agreed, holding that "[t]he law places the burden on Defendants to work with Doe to find or establish an acceptable SLP II or CTH I setting, which, so far, they have utterly failed to do." Doe II, 419 F. App'x at 418. We further held:

> (1) that Defendants never provided Doe with residential habilitation services in a SLP II or CTH I setting; (2) that the CTH II respite services that have been provided to Doe since July 2003 are not the equivalent of the SLP II or CTH I residential habilitation services to which she is entitled; and (3) that, given Defendants' continuing violations of the timeliness provisions of the Medicaid Act and its regulations, they are ordered to provide Doe with services in a SLP II or CTH I facility of her choice (at least pending the outcome of her state appeal).

Id. at 419 (emphasis added). In light of these emphatic holdings, there can be very little doubt that this Court's order "materially alter[ed] the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefit[ed] the plaintiff." Farrar, 506 U.S. at 111–12.

Turning to the second factor, we hold that the legal issue on which Doe prevailed is an important one. Doe's case established that § 1396a(a)(8) of the Medicaid Act creates a private right of action that is enforceable through § 1983. Doe's case was the first to so hold in this Circuit, and has

19

served as guidance to courts and parties facing this issue and similar issues that have arisen under the Medicaid Act, and will continue to do so. See, e.g., Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health, 699 F.3d 962, 975–76 (7th Cir. 2012); Grammer v. John J. Kane Reg'l Ctrs.-Glen Hazel, 570 F.3d 520, 527 (3d Cir. 2009). This case, unquestionably, opened the courthouse doors that had formerly been closed to such actions.

The final factor we must consider is whether the litigation served a public purpose, as opposed to simply vindicating the plaintiff's individual rights. See Farrar, 506 U.S. at 121–22 (O'Connor, J., concurring) (explaining that a plaintiff's "success might be considered material if it also accomplished some public goal other than occupying the time and energy of counsel, court, and client"). As previously discussed, Doe's case was the first to establish in this Circuit that a litigant can enforce their rights under the Medicaid Act through § 1983. Thus, Doe's case was important in that it marked a milestone in the development of the law under the Medicaid Act.

For these reasons, the district court did not abuse its discretion in determining that Doe was entitled to attorneys' fees.

20

Having determined that the district court did not abuse its discretion in its determination that Doe is entitled to attorneys' fees, we turn to the district court's calculation of the attorneys' fee award.

1.

Returning to step one – calculation of the lodestar fee amount – we find that the district court abused its discretion in two separate ways:  first, when it determined the prevailing market rate for similar work in calculating Doe's lead counsel's hours;  and second, when it reduced Doe's paralegal and co-counsel rates without providing any explanation on why it did so.  See Robinson, 560 F.3d at 243.  We, however, find no error in the district court's twenty-five percent reduction to Doe's lead counsel's and paralegal's hours for excessiveness.

Doe's legal team consisted of two lawyers and a paralegal: Patricia Harrison as lead counsel, Armand Derfner as co-counsel, and Nancy Law as their paralegal.  In Doe's motion, she sought attorneys' fees as follows:  Harrison's hourly rate was $425 for 1,770.4 hours; Derfner's hourly rate was $480 for 148.8 hours; and Law's hourly rate was $150 for 317.5 hours.  In total, Doe sought $871,469 in legal fees for the federal litigation.

The district court determined that, "given lead counsel's limited litigation experience, the nature of the case, and the

21

market in South Carolina, $280 is an adequate hourly rate" for Harrison. J.A. 2299. The court then, without providing any explanations, reduced Law's hourly rate to $85 and, despite acknowledging "Derfner's national reputation," J.A. 2299, reduced his hourly rate to $450. Further, based on the first Johnson factor - time and labor expended – the court reduced Harrison's and Law's hours by twenty-five percent. Therefore, the district court determined the lodestar multipliers to be as follows: Harrison's hourly rate was $280 for 1,327.8 hours; Derfner's hourly rate was $450 at 148.8 hours; and Law's hourly rate was $85 at 238.13 hours. Based on these numbers, the district court determined the lodestar figure to be $458,985.05. Both parties appeal the district court's lodestar calculation.

a.

Both Doe and the defendants contend, for different reasons, that the district court abused its discretion in its determination of Harrison's hourly rate. The defendants' contention that the district court failed to consider any applicable rates in the relevant community is wholly without merit, as the district court clearly did. See J.A. 2295-96. Doe, however, argues that the district court erred by failing to determine the prevailing market rates in the relevant community, as required by our precedent. See, e.g., Plyler v. Evatt, 902 F.2d 273, 277 (4th Cir. 1990). We agree.

22

As the fee applicant, Doe bore the burden of establishing the reasonableness of those hourly rates. See id. A fee applicant is obliged to show that the requested hourly rates are consistent with "the prevailing market rates in the relevant community for the type of work for which [s]he seeks an award." Id. The evidence we have deemed competent to show prevailing market rates includes "affidavits of other local lawyers who are familiar both with the skills of the fee applicants and more generally with the type of work in the relevant community." Robinson, 560 F.3d at 245. Both parties submitted affidavits about the appropriate rate for Harrison. Doe submitted two affidavits in support of the requested rate for Harrison – both affiants testified that $425 per hour is a reasonable rate for Harrison. While it appears that the court did not find Doe's affidavits persuasive (or the defendants'), it did note that this was a "complex civil litigation" case. J.A. 2296.

Despite its finding that this was a "complex civil litigation" case, the district court, remarkably, only reviewed attorney rates in ordinary run-of-the-mill civil cases. The district court reviewed rates in three cases – an employment law case, an intellectual property law case, and a copyright infringement case. None of the cases reviewed by the court could remotely be considered a "complex civil litigation" case. In fact, the courts in all three cases determined that the cases

23

before them were straightforward, requiring no expertise or special skills. See, e.g., Evans v. Milliken & Co., 7:13-cv-02908-GRA, 2014 WL 508508 at *2 (D.S.C. Feb. 6, 2014). In Evans, for example, the district court determined that a rate of $280 for two lawyers was appropriate in a case that required no "special skill." Id. ("While attorneys Kilgore and Giles have experience in the employment law field and may command premium rates for work that requires that expertise, the Court believes that an hourly rate of $280 is appropriate for the type of legal work performed and for which an award is being made. In the opinion of the Court, the work performed in this case relating to jurisdiction and venue does not require special skill in the employment law area."); see also H&C Corp., Inc. v. PukaCreations, LLC., 4:12-cv-00013-RBH, 2013 WL 2303248 at *2 (D.S.C. May 24, 2013) ("While attorneys Klett and Kanos have expertise in the intellectual property field and may command a higher hourly rate for work that requires that expertise, the Court believes that an hourly rate of $265 is appropriate for the type of legal work performed and for which an award is being made. The work performed in this case relating to the defendant's default does not require special skill in the intellectual property law area in the opinion of the Court." (emphasis added)).

In support of her motion for attorneys' fees, Doe cited to South Carolinians for Responsible Government v. Krawcheck, 2012 WL 2830274 (D.S.C. July 9, 2012). Like this case, the plaintiff in Krawcheck brought its case pursuant to § 1983. The plaintiff claimed that a South Carolina statute violated its rights under the First Amendment. The same district court involved in this case determined that a rate of $425 was appropriate for lead counsel – a counsel with less experience than Harrison - in Krawcheck. Id. at *2. Surprisingly, this district court did not address, let alone distinguish, why the rate in Krawcheck was inappropriate for this case.

For these reasons, the district court abused its discretion in its determination of the prevailing market rates in South Carolina for complex civil litigation. Based on the record before the district court, Doe has more than met her burden of establishing the reasonable hourly rate for Harrison.[2]

_____

[2] Likewise, the district court abused its discretion in its determination of Derfner's and Law's hourly rate. The district court did not provide any reasons on why both rates should be reduced, and, as the district court is well aware, it must explain how it arrived at its determination with sufficient specificity to permit an appellate court to determine whether the court abused its discretion in the way the analysis was undertaken. See, e.g., McCown v. City of Fontana, 565 F.3d 1097, 1102 (9th Cir. 2008); Robinson, 560 F.3d at 245. In fact, the district court, oddly, acknowledged Derfner's national reputation before it reduced his rate. Further, on at least one other occasion, this district court found an hourly rate of $140 for a paralegal reasonable, which is very near the hourly rate (Continued)

25

b.

Doe and the defendants both contend, for different reasons, that the district court abused its discretion in its twenty-five percent reduction of Harrison's and Law's hours for excessiveness under the first Johnson factor.[3] The defendants assert that there should have been a greater reduction. Doe argues that there should have been no reduction for excessiveness. For the reasons stated below, we reject both arguments as baseless and hold that the district court did not abuse its discretion.

In determining the appropriate number of hours to be included in a lodestar calculation, the district court should exclude hours "that are excessive, redundant, or otherwise unnecessary." Hensley, 461 U.S. at 434. Here, the district

---

Doe seeks here. Krawcheck, 2012 WL 2830274 at *2. Based on this record, Doe has met her burden in establishing the reasonable hourly rate for Derfner is $480 and, consistent with what the district court did in Krawcheck, we find that an hourly rate of $140 for Law is appropriate.

[3] The defendants further argue that the district court abused its discretion by failing to find Derfner's hours excessive under the first Johnson factor. Defs.' Opp. Br. at 50. While it is true that the defendants did object to Derfner's hours under this factor, the district court determined that it was "satisfied with the number of hours billed by counsel Derfner." J.A. 2294. Moreover, the defendants do not proffer any reasons as to why Derfner's hours should be reduced for excessiveness. Accordingly, we affirm the district court's decision on this issue.

26

court determined that Harrison's hours should be reduced by twenty-five percent for excessiveness because her time "includes numerous entries for copying, organizing files, and other clerical/paralegal tasks," and "the court was required to hold a hearing and issue an order instructing lead counsel as to inappropriate questions that could not be propounded during depositions." J.A. 2294. Similarly, the court concluded that Law's hours were excessive because she included an exorbitant amount of time reviewing the file and performing clerical tasks. Id. We find no abuse of discretion in these findings, and will not accept the parties' invitation to reweigh the evidence.[4] We therefore affirm the court's twenty-five percent reduction.

---

[4] Doe makes the passing argument that the district court abused its discretion because it did not take into account over three hundred "hours of voluntary reductions" made by Harrison. It can hardly be said that the district court abused its discretion because it failed to take into account a reduction by Harrison in her hours, some of which were reduced because of billing errors on her end. Doe Br. 15. Further, it appears that Doe does not even contest the district court's reduction for Law. Thus, we reject Doe's argument as meritless. See Brodziak, 145 F.3d at 196 (stating that we will only reverse an attorney's fee award if the district court is "clearly wrong" or has committed an "error of law").

The defendants assert that the district court should have reduced Harrison's and Law's hours by a greater percentage for excessiveness. The defendants only cite a chart that they prepared for the district court – with vague numbers indicating what they believed was excessive billing. The court considered and, in exercising its judgment, declined to adopt the defendants' chart. The defendants cannot seriously argue that the court abused its discretion; in fact, the defendants only (Continued)

27

After determining the lodestar figure – hours expended multiplied by attendant rates - a court is obliged to "subtract fees for hours spent on unsuccessful claims unrelated to the successful ones." Grissom v. Mills Corp., 549 F.3d 313, 321 (4th Cir. 2008).

Here, the district court, in a very cursory analysis, stated that the "defendants' arguments are well taken," cited a vague chart provided by the defendants, and then significantly cut Doe's lead counsel and paralegal hours as follows: 700 hours were cut from the court's calculation of Harrison's lodestar hours, resulting in a fifty-two percent reduction; and 70 hours were cut from the court's calculation of Law's lodestar hours, resulting in a thirty percent reduction. The court did not provide any reasons on why it made such a steep cut; it just cited a chart prepared by the defendants.

The chart the defendants proffered, and the district court relied so heavily on, provides very vague categories of hours they believed Harrison and Law spent on unsuccessful claims. For example, one category is, interestingly, entitled "Vague."

---

generally remark that the court "erred in not making the greater reductions [they suggested] to the hours of Harrison and Law." Defs.' Br. 50-51. The defendants, however, proffer no arguments on why they believe the district court abused its discretion.

28

J.A. 2185. Another category is labelled "Not related to matters actually litigated," id., but it does not contain what those matters are. Further, the defendants asked the district court to deduct hours for work that Doe's lawyers performed after Doe II, including seeking placement in a facility that this Court said was appropriate. This chart – besides being completely useless and unhelpful – cannot support any reductions, let alone such significant reductions, made by the district court.

Therefore, because the district court already made a twenty-five percent reduction for excessiveness and clerical tasks,[5] and because the district court's reliance on the defendants' chart was clear error, we find that a reduction for hours spent on unsuccessful claims is unwarranted.

---

[5] We have serious concerns that the district court, because it did not state with any specificity the reasons for the substantial reduction in hours for unsuccessful claims, may have double counted a Johnson factor already considered in calculating the lodestar. See, e.g., Black v. SettlePou, P.C., 732 F.3d 492, 502 (5th Cir. 2013) ("The lodestar may not be adjusted due to a Johnson factor that was already taken into account during the initial calculation of the lodestar."); Millea v. Metro–N. R.R. Co., 658 F.3d 154, 167 (2d Cir. 2011) ("[A] court may not adjust the lodestar based on factors already included in the lodestar calculation itself because doing so effectively double-counts those factors."). Surely, the twenty-five percent reduction for excessiveness would cover several categories in the "unsuccessful aspects of the case" chart provided by the defendants, such as the "discovery," "clerical," and "Post-Doe II." Compare J.A. 2185 (defendants' chart providing hours spent on unsuccessful aspects of the case), with J.A. 2187 (defendants' chart for excessive hours).

29

3.

In the final step before making an attorneys' fee award under § 1988, a district court must "consider the relationship between the extent of success and the amount of the fee award." McAfee v. Boczar, 738 F.3d 81, 92 (4th Cir. 2013); see also Johnson v. City of Aiken, 278 F.3d 333, 337 (4th Cir. 2002) ("Once the court has subtracted the fees incurred for unsuccessful, unrelated claims, it then awards some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff."). The court will reduce the award if "the relief, however significant, is limited in comparison to the scope of the litigation as a whole." Hensley, 461 U.S. at 439–40. Indeed, the Supreme Court has recognized that the extent of a plaintiff's success is "the most critical factor" in determining a reasonable attorneys' fee under § 1988. Id. at 436. What the court must ask is whether "the plaintiff achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award." Id. at 434.

After the district court completed the first two steps, it calculated the remaining fees to be $265,675.05. The court then reduced that number to $100,000, or sixty-three percent, because "there ha[d] been no change in the status quo." J.A. 2300. The district court reasoned that "DDSN was required to

tender alternate placement in a CTH I or SLP II facility in 2003 when the initial offer was rejected." Id. And, because "lead counsel's objective in this litigation has been to obtain residential habilitation in a CTH II facility, a remedy this court could not provide," Doe's success has been "limited under the circumstances." Id. The district court's analysis grossly understates Doe's success.

As Doe observed in her brief, the litigation was vigorously contested by the defendants at every step, and in view of the district court's rulings, Doe was required to appeal twice to this Court, each time succeeding in her effort. As a result, Doe contends, and we agree, that her case changed the legal landscape under the Medicaid Act. For reasons previously discussed, see supra Part III.A, this case opened the courthouse doors to claims that courts in this Circuit, including this district court, had routinely closed on plaintiffs. Plaintiffs now can enforce their rights under the Medicaid Act through § 1983 – a direct result of Doe's efforts in this case. Importantly, the district court failed to recognize that the defendants – not Doe – repeatedly violated the Medicaid Act, even after Doe I and Doe II was decided. It was not until August 2013, two and a half years after Doe II, that the defendants came into compliance with the Medicaid Act. Moreover, the fact that the state administrative body found in

31

Doe's favor – allowing her to seek CTH II placement – before this district court awarded her appropriate relief, does not diminish what Doe accomplished in this case.

For these reasons, the district court abused its discretion in imposing a sixty-three percent across-the-board reduction of the fee request.

\*\*\*\*\*

Under such circumstances, we typically would remand this case for further work by the district court and the lawyers. We have recognized, however, that "[a] request for attorney's fees should not result in a 'second major litigation.'" Rum Creek Coal Sales, Inc. v. Caperton, 31 F.3d 169, 181 (4th Cir. 1994) (citing Hensley, 461 U.S. at 437 n.12).

Consistent with Rum Creek, and to avoid further expense and the nonessential use of judicial resources associated with remand proceedings and other appeals, we are satisfied to vacate the attorneys' fee award and direct that it be entered as follows: Harrison shall receive a rate of $425 an hour for 1,327.80 hours (1770.4 x .75, which reflects the twenty-five percent reduction), for a total of $564,315; Law shall receive a rate of $140 (the same rate this district court determined to be reasonable in Krawcheck) for 238.13 hours (317.5 x .75, which reflects the twenty-five percent reduction), for a total of $33,338.20; and Derfner shall receive a rate of $480 for 148.8

32

hours for a total of $71,424. In total, Doe is entitled to $669,077.20 in fees, exclusive of costs. See id. (modifying award of attorneys' fees "[t]o avoid further litigation expenses that would follow a remand and the risk of yet a fourth appeal").

C.

In addition to attorneys' fees, Doe sought to assess guardian ad litem fees against the defendants in the amount of $39,173.75 for the federal litigation, which included 223.85 hours at a rate of $175 per hour.[6] The district court determined that $3,750 was appropriate in guardian ad litem fees, reducing the guardian ad litem hourly rate to $75 and hours to 50. The district court reasoned that even if a guardian ad litem's fees and expenses may be taxed as costs under Rule 54(d), those costs and fees may not include services the guardian ad litem performs as attorney to Doe. J.A. 2301 (citing Kollsman v. Cohen, 996 F.2d 702, 706 (4th Cir. 1993)). Because "much of the work performed by the guardian ad litem included legal work," the district court significantly reduced Doe's request. Id. Doe then filed a motion for reconsideration under Federal Rule of

---

[6] In total, Doe sought $59,018.75 in guardian ad litem fees, which included hours spent by the guardian ad litem in both the federal and state litigation (337.25 hours at a rate of $175 per hour).

33

Civil Procedure 59(e), which the district court denied for similar reasons.

We review the denial of a Rule 59(e) motion for abuse of discretion. Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 674 F.3d 369, 378 (4th Cir. 2012). A Rule 59(e) motion may only be granted in three situations: "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." Id.

Courts have interpreted Federal Rule of Civil Procedure 54(d) to allow taxation of guardian ad litem expenses as costs against the United States. See Kollsman, 996 F.2d at 702; Lebron v. United States, 279 F.3d 321, 332 (5th Cir. 2002). Rule 54(d) states, "costs - other than attorneys' fees – should be allowed to the prevailing party." Fed. R. Civ. P. 54(d). Where the same person performs services as a guardian ad litem and as an attorney, only fees for services rendered in the role of guardian ad litem are taxable as costs. Hull v. United States, 971 F.2d 1499, 1510 (10th Cir. 1992). It is well recognized that the guardian ad litem serves essentially as an officer of the court and looks after the interests of the plaintiff. See Kollsman, 996 F.2d at 702; Hull, 971 F.2d at 1510; duPont v. S. Nat. Bank of Hous., 771 F.2d 874, 882 (5th Cir. 1985); Schneider v. Lockheed Aircraft Corp., 658 F.2d 835,

34

854 (D.C. Cir. 1981); Franz v. Buder, 38 F.2d 605, 606 (8th Cir. 1930). The guardian ad litem is there not only to manage the litigation for the incompetent but also to assist the court in performing its duty to zealously protect the incompetent's interests. See Kollsman, 996 F.2d at 706. As such, the guardian ad litem's "costs and expenses are appropriately chargeable under Rule 54." Id.

Even if the guardian ad litem performed legal tasks for the plaintiff, such as legal research, the court can tax these expenses as costs so long as the guardian ad litem did not perform the legal tasks in the role of the plaintiff's attorney. Hull v. United States, 53 F.3d 1125, 1128 (10th Cir. 1995). To the extent that the guardian ad litem was performing her guardian role - acting as an officer of the court and looking after the interests of the plaintiff - the defendant should pay the guardian ad litem fees.

In 2003, the district court appointed Dr. Sandra Ray to serve as Doe's guardian ad litem pursuant to Federal Rule of Civil Procedure 17(c). Dr. Ray was selected as guardian ad litem because of her specialized experience working with persons who have mental and physical disabilities. Dr. Ray has logged 223 hours in the federal litigation. There was active litigation in this case for over eleven years (2003-2014), which

35

means Dr. Ray spent, on average, approximately 20.27 hours per year as guardian ad litem to Doe.

Dr. Ray provided all of her time entries with a description of what she spent the time on to the district court. It is clear that Dr. Ray at no point performed legal tasks on behalf of Doe, but, instead, was looking after Doe's interests. For example, she would review filings in this Court, spending a half hour and up to an hour and a half reviewing appellate briefs. Similarly, Dr. Ray would review Doe's responses to interrogatories. This is hardly performing legal tasks in the role as Doe's attorney, as Dr. Ray never drafted any documents, filed any documents, or conducted legal research in this case. In fact, this is what courts expect from a guardian ad litem – to zealously protect the incompetent's interests. See Kollsman, 996 F.2d at 706. For these reasons, we find that the district court erred in reducing the guardian ad litem's hours.

We further find that the district court erred in its determination of the guardian ad litem's rate. The district court, citing no authority or declarations, determined a rate of $75 per hour to be adequate. Doe provided two declarations supporting the rate requested for Dr. Ray. Both affiants testified that $175 is a reasonable hourly rate for a guardian ad litem in South Carolina for a complex case, as both affiants have received rates between $150-$250, depending on the

36

complexity of the case. Further, while there are not many cases that discuss the rate of the guardian ad litem, courts have recently determined that hourly rates of $200 and $350 are reasonable for a complex case, albeit in different markets. See, e.g., Jacobs v. United States, No. 08-civ-8061, 2012 WL 5504783, at *23 (S.D.N.Y. Nov. 13, 2012) (guardian ad litem rate of $350 reasonable); Metro. Life Ins. Co. v. Brown, 300-cv-1017L, 2002 WL 32140310, at *4 (N.D. Tex. Dec. 23, 2002) (guardian ad litem rate of $200 reasonable).

We, therefore, direct that the district court enter an order awarding Doe with the total amount - $39,173.75 - she requests in guardian ad litem fees for the federal litigation.

D.

The district court determined that Doe was not entitled to any fees related to the state litigation. The court reasoned that the work performed by counsel in state court related to the defendants' determination to terminate the benefits to which it had found Doe entitled to in 2003. In other words, because DDSN maintained that Doe was not intellectually disabled, she was no longer eligible for the waiver program. The court further reasoned that the "state court proceedings were not necessary to advance the litigation in this court, i.e., whether Defendants provided placement at a qualified CTH I or SLP II facility with reasonable promptness." J.A. 2293. We disagree, and find that

37

the state litigation "was both useful and of a type ordinarily necessary to advance the civil rights litigation to the stage it reached," see Webb v. Dyer Cty. Bd. of Educ., 471 U.S. 234, 243 (1985), before Doe ultimately received a placement she believed would address her needs.

In 2003, the defendants determined that Doe was eligible for the Medicaid waiver program and authorized CTH I or SLP II services for Doe at a residential center. That same year, Doe filed this suit after failing to receive any residential habilitation services. Doe sought an injunction that would require the defendants to provide the services that they deemed she was eligible for with reasonable promptness, as required by the Medicaid Act. Rather than comply with the Medicaid timeliness provisions, the defendants reevaluated Doe, determining (wrongly) that she no longer met the state-law definition of intellectual disability; Doe thus was ineligible for the waiver program. At that point, Doe had two options: first, she could waive her right to appeal the defendants' determination through state proceedings, and, consequently, give up her claim for injunctive relief in this case. Second, she could do exactly what she did here – challenge the defendants' determination in state administrative proceedings in order to enforce her rights under the Medicaid Act. The "choice," if we can call it that, was easy, as the penalty was clear.

And, because Doe successfully challenged the defendants' determination in state proceedings, she received the relief she desperately sought – this Court ordered the defendants to provide Doe with services in a SLP II or CTH I facility of her choice in a reasonably prompt manner. For this reason, we find that the state litigation "was both useful and of a type ordinarily necessary to advance the civil rights litigation to the stage it reached." See Webb, 471 U.S. at 243.

We therefore remand to the district court for appropriate consideration of Doe's request for fees in the state administrative proceedings.

IV.

For the foregoing reasons, we vacate the attorneys' fee award and direct entry for an award of $669,077.20, exclusive of costs; we vacate the guardian ad litem fee award and direct entry for an award of $39,173.75; and we remand for further proceedings consistent with this opinion.

VACATED AND REMANDED